726 A.2d 745

## OWENS CORNING

v.

**Leroy A. BAUMAN, et al.**

**No. 744, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 1, 1999.

Opinion on Motion for Clarification April 7, 1999.

458

460

**462**

Thomas G. Hungar (Mark A. Perry, Larry L. Simms, Wesley L. Hsu, Gibson, Dunn & Crutcher LLP, Washington, DC, John Parker Sweeney, Gregory L. Lockwood and Miles & Stockbridge, Baltimore, on the brief), for appellant.

Shepard A. Hoffman (Brian G. Parker, Douglas S. Reinhart and Gebhardt & Smith LLP on the brief), Baltimore, for appellees.

Steven G. Warm, Baltimore, for amicus curiae, White Lung Ass'n.

Thomas V. Monahan, Jr. and Goodell, DeVries, Leech & Gray, LLP, Baltimore, for amicus curiae, Maryland Defense Counsel.

Argued before MURPHY, C.J., and DAVIS and HARRELL, JJ.

DAVIS, Judge.

In this appeal, appellant Owens Corning, and amicus curiae, Maryland Defense Counsel, seek to have this Court revisit its decision in *Anchor Packing Company v. Grimshaw*, 115 Md. App. 134, 692 A.2d 5 (1997), *vacated in part on other grounds*

*sub nom. Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998). Owens Corning appeals from a jury award in favor of appellee, James R. Hammond,[1] in the amount of $1,286,000 in economic damages and $15,000,000 in noneconomic damages and judgment entered thereon.

Appellant had sought to have the trial judge impose the statutory cap, pursuant to MD.CODE (1995 Repl.Vol., 1998 Supp.), CTS. & JUD. PROC. (C.J.), § 11–108(a)(2) and, alternatively, to reduce the noneconomic damages award because it exceeded the $10,000,000 requested in the *ad damnum* clause of appellee's complaint. Appellant also had moved to exclude the testimony of appellee's expert, Dr. Hammar, on the ground that it did not comport with the *Frye/Reed*[2] standard for admissibility of scientific evidence.

Subsequent to the jury verdict, in response to post-trial motions filed by appellant, the trial judge reduced the jury verdict to $10,000,000 to conform to appellee's *ad damnum* clause in his complaint and also reduced the verdict by an additional $20,000 to reflect the amount received by appellee in a prior settlement. Owens Corning timely noted this appeal, whereupon appellee filed a cross-appeal challenging (1) the propriety of the reduction of the jury award to conform with the *ad damnum* clause and (2) the court's refusal to submit the issue of punitive damages to the jury.

On appeal, appellant raises the following issues that we restate for clarity:

I. Whether a cause of action for personal injury "arises" for purposes of Maryland's statutory cap on noneconomic damages when plaintiff's disease comes into existence or when it is diagnosed or manifests itself.

---

1. This appeal is captioned *"Owens Corning v. Bauman"* because the Circuit Court for Baltimore City, through an order dated April 10, 1995, consolidated multiple asbestos-related claims into a trial cluster with "Leroy Bauman" designated as the lead case although James R. Hammond is the party in interest.

2. The *Frye/Reed* standard refers to the principles articulated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

II. Whether the court properly accepted the testimony of Dr. Hammar regarding the onset date of appellee's mesothelioma.

III. Whether the trial court erred in refusing appellant's request to submit to the jury the question of the date of onset of appellee's mesothelioma.

IV. Whether the jury award of noneconomic damages must be remitted on the grounds that it is excessive as a matter of law.

Appellee asks us, in his cross-appeal, to address the following issues:

I. Whether C.J. § 11–108 violates the Maryland Declaration of Rights and the Maryland Constitution.

II. Whether the trial court erred by denying appellee's request for leave to amend the amount in the *ad damnum* clause to conform to the jury award.

III. Whether the trial court erred in refusing to submit the issue of punitive damages to the jury.

Amicus curiae Maryland Defense Counsel replicates much of the argument of appellant, with special emphasis on the proposition that the event triggering application of the statute should be physical impairment of the plaintiff as part of the manifestation standard. There is also extensive overlay of the issues presented by amicus curiae, White Lung Association, with those raised by appellee; however, White Lung Association offers an exhaustive exposition in favor of current medical knowledge of tumor growth and metasticism and further in support of declaring the statutory cap unconstitutional. Because of our ultimate holding that knowledge of the state of the art by the medical community is of little assistance in our legal determination whether the cap statute embodies an onset-of-disease standard, our discussion of the medical data submitted is limited. Likewise, because we believe the law is clear regarding the constitutionality of the statute, our discussion of this issue also will be limited. Because Article 23 of the Maryland Constitution guarantees the right to trial by jury where issues of fact are involved, however, we hold that, when the parties dispute the point in time that a latent

asbestos-related disease comes into existence, that determination, for purposes of applying the noneconomic statutory cap, must be made by the jury.

## FACTUAL BACKGROUND

Appellee enlisted in the United States Navy in 1974 and was assigned to the USS Nimitz in April 1975 where he served until November 1978. Assigned the task of running a co-axial communication cable along a 600–foot passageway, appellee was exposed to pipes that had been insulated with the asbestos-containing kaylo pipe covering manufactured by Owens Corning. In the course of installing the cable, appellee was required to sand the insulation around the pipes in order to gain access to the bulkheads along the passageway. Clouds of asbestos dust created by the sanding would hover in the small compartments where appellee worked.

Over time, appellee developed pleural mesothelioma from exposure to the dust from the kaylo-type covering. He first experienced symptoms of cancer in the spring of 1994, at which time he developed an acute pain in his side that lingered for months. Appellee developed respiratory problems in 1995 which, according to appellee, prevented him from walking up a "single flight" of stairs. He was diagnosed as suffering from pleural mesothelioma in May 1995 at the age of thirty-nine.

Despite surgery intended to remove the pleura from around appellee's lung, and subsequent intensive chemotherapy under the auspices of a clinical program that had been established by the National Institutes of Health, his symptomatology continued unabated and his cancer persisted up to and during the time of trial.

## DISCUSSION

## I. THE MARYLAND CAP ON NONECONOMIC DAMAGES

*Defining the Issue*

Citing principally the asserted uncertainty Owens Corning believes results from the *Grimshaw* construction of "arises"

and the asserted conflict between the *Grimshaw* standard and the language and purpose of the noneconomic damages cap, Owens Corning now asks us to reject the onset-of-disease standard of *Grimshaw,* thereby reversing that decision, and to adopt the manifestation of physical impairment/diagnosis standard [3] of *Buttram v. Owens–Corning Fiberglas Corp.,* 16 Cal.4th 520, 66 Cal.Rptr.2d 438, 941 P.2d 71 (Cal.1997). In asking us to reject the *Grimshaw* holding, Owens Corning points to the reversal of *Peterson v. Owens–Corning Fiberglas Corp.,* 50 Cal.Rptr.2d 902 (1996), *vacated,* 71 Cal.Rptr.2d 214, 950 P.2d 58 (1997), which, Owens Corning contends, provided the rationale underpinning our decision in *Grimshaw.* Additionally, appellant contends that the *Grimshaw* standard results in a "battle of the experts" in determining the applicability of the cap.

Owens Corning further argues, citing *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 734–35, 591 A.2d 544 (1991) (*Armstrong I* ), that under Maryland law, there can be no "legally compensable injury" in tort cases until such time as a plaintiff suffers physical or functional impairment. Arguing that we adopted a "bright-line" rule, i.e., the manifestation standard, in *ACandS, Inc. v. Abate,* 121 Md.App. 590, 710 A.2d 944, *cert. denied,* 350 Md. 487, 713 A.2d 979 (1998), Owens Corning claims the result is that *Grimshaw* and *Abate* are inconsistent and we, accordingly, should reject our holding construing the meaning of "arises" in *Grimshaw.* Owens Corning also contends that *Ford Motor Co. v. Wood,* 119 Md.App. 1, 703 A.2d 1315 (1998), illogically draws a distinction between diseases that are not actionable in the absence of symptoms and other diseases that give rise to a cause of action immediately upon onset, even in the absence of symptoms. More specifically, Owens Corning sets forth the following footnote from *Ford,* which it contends "fails to reconcile the fact that the court in *Grimshaw* purported to apply the

---

**3.** This standard permits recovery when plaintiff has sustained symptoms or been impaired in his or her ability to perform normal functioning by a disease or condition.

onset-of-disease standard to asbestos-related disease generally":

> If certain anatomical changes occur in a person as a result of a latent process, in some instances, the appearance of symptoms will make the condition a legally compensable injury. By contrast, a condition such as cancer is a compensable injury when it comes into existence even without symptomatology.

*Id.* at 45 n. 11, 703 A.2d 1315.

Our reiteration of the onset-of-disease standard, that Owens Corning complains *Grimshaw* "applies generally to asbestos-related diseases," is found at 115 Md.App. at 160, 692 A.2d 5:

> We hold, therefore, that an injury occurs in an asbestos-related injury case when the inhalation of asbestos fibers causes a legally compensable harm. Harm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer. We, therefore, reject appellants' assertion that the injury or harm does not arise until the symptoms of the disease become apparent. Appellants argue that such an approach would be less speculative. We disagree.

We had reached this conclusion, in part, in reliance upon the decision of the Court of Appeals in *Oxtoby v. McGowan,* 294 Md. 83, 447 A.2d 860 (1982). There, the Court of Appeals, interpreting the effective date clause of the Health Care Malpractice Claims Act requiring claimants to submit to arbitration before seeking judicial remedies, determined that the "[health care malpractice claims][a]ct is concerned with the invasion of legally protected interests coupled with harm." *Id.* at 94, 447 A.2d 860.

Initially, we are constrained to look first to the language of the statute and attempt, insofar as possible, to glean the legislative intent in its enactment. The language of the statute is the focal point of our analysis, and we must accord the words their ordinary meaning as generally understood and as construed by Maryland appellate courts. The statute in question, C.J. § 11–108, provides:

■■■■■■■■■■■

(a) *Definitions.*—In this section:

(1) "Noneconomic damages" means:

(i) In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other non-pecuniary injury; and

(ii) In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article; and

(2) "Noneconomic damages" does not include punitive damages.

. . .

(b) *Limitation on amount of damages established.*—(1) In any action for damages for personal injury in which the *cause of action arises* on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(Emphasis added.)

Explication hereinafter as to how divergent cellular changes result from exposure to carcinogens and accordingly dictate different analyses in our recent decisions is necessitated because a major thrust of appellant's argument is our alleged inconsistent application of the cap to latent diseases in those decisions. Specifically, as we explain in the discussion that follows, our determination as to when mesothelioma, asbestosis, and pleural plaque "come into existence," for purposes of applying the statutory cap, depends on the peculiar qualities of these diseases and how they affect cellular change. With respect to appellant's reliance on appellate decisions from foreign jurisdictions interpreting a particular statute applicable in each of those jurisdictions, these decisions provide little, if any, assistance in a determination of the proper construction of a Maryland statute. Finally, while there can be no doubt— as evidenced by the authorities and legislative history we reference, *infra*—as to the principal policy considerations that

led to the enactment of C.J. § 11–108, the law contemplates that public policy issues be debated and decided in fora specifically designated to set public policy concomitant with the wide spectrum of interests involved.

### Grimshaw/Peterson/Armstrong II

Appellant asserts, "[T]he *Grimshaw* opinion quotes *Peterson* extensively in rejecting concerns about the inherent questionable medical testimony necessitated by 'an onset' standard. . . ." Appellant then sets forth a quotation from *Grimshaw* in which we noted that the *Peterson* court rejected the argument of Owens Corning that "a test hinging on the inception of an undetected disease will unnecessarily interject confusing and questionable medical testimony into asbestos trials, making outcomes uncertain and inviting speculation, manipulation of facts, and 'statistical guessing.'" *Grimshaw*, 115 Md.App. at 161, 692 A.2d 5 (quoting *Peterson*, 50 Cal.Rptr.2d at 909). The court simply dismissed "this parade of horribles," acknowledging that the onset-of-disease test will require testimony of medical experts in most, if not all, cases. *See id.*

To be sure, *Peterson* had stood squarely for the proposition that, "[w]hen exposure to a toxic substance causes cancer in an individual, that person is injured or harmed by the acquisition of the disease, whether or not he is aware of its presence." *Peterson*, 50 Cal.Rptr.2d at 907. *Peterson* had relied on the Restatement Second of Torts, § 7, sub.(d)(3) for the proposition that physical changes to the body constitute physical harm. *See id.* at 906–07. In adopting the onset-of-disease test, *Peterson* fashioned the rule that an individual sustains an injury "when he has undergone a physiological change that will, to a reasonable degree of medical certainty, result in the condition giving rise to the cause of action." *Id.* at 907. The Court focused on cells which have "embarked upon an irreversible progression towards the disease, which is invariably fatal. At the point of that initial cellular change, the individual has experienced no symptoms and, because he [or she] is

unaware of his [or her] condition, has suffered no associated emotional distress or compensable fear of cancer." *Id.*[4]

Although we cited the court's opinion in *Peterson,* a cursory reading of *Grimshaw* hardly leads to the conclusion that we ameliorated concern about the "inherently questionable" medical testimony necessitated by the onset standard by relying on *Peterson* extensively. While the rationale of *Peterson* solidly supported the "onset test," the decision in no way provided the foundation for *Grimshaw.*

Our decision rested squarely upon the construction the Court of Appeals placed on the term "arises" in *Owens–Illinois v. Armstrong,* 326 Md. 107, 604 A.2d 47 (*Armstrong II* ), *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992). Notably, the Supreme Court of California, as will be discussed in detail, *infra,* expressly distinguished *Armstrong II* in its discussion in *Buttram,* upon which appellant would now have us rely.

The Court of Appeals, in *Armstrong II,* had specifically held:

> We agree with the Court of Special Appeals'[s] conclusion that *a cause of action in negligence or strict liability arises "when facts exist to support each element."* In a negligence claim, the fact of injury would seemingly be the last element to come into existence. The breach, duty, and causation elements naturally precede the fact of injury. Likewise in a strict liability claim, the existence of the defective product and the causal connection will precede the resultant injury. Therefore, Armstrong's noneconomic damages should be reduced under Section 11–108 of the Courts & Judicial Proceedings Article *only if his "injury" came into existence on or after July 1, 1986.*

---

4. As appellant points out, review of the California Court of Appeal's decision was granted, *see* 950 P.2d 58 (1997), and the Supreme Court of California, on December 23, 1997, transferred the case to the First Appellate District, Court of Appeal, with directions to vacate its decision and to reconsider the cause in light of *Buttram v. Owens–Corning Fiberglas Corp.,* 16 Cal.4th 520, 66 Cal.Rptr.2d 438, 941 P.2d 71 (1997). We shall discuss the *Buttram* decision in detail, *infra.*

*Armstrong II,* 326 Md. at 121–22, 604 A.2d 47 (citation omitted; emphasis added).

Furthermore, in *Grimshaw,* we recapitulated our discussion, citing *Armstrong II:*

> To summarize thus far, a cause of action arises in an asbestos-related injury claim for purposes of determining the applicability of C.J. § 11–108 when each of the elements of the claim are met. In Maryland, the injury element of a negligence claim is satisfied when a wrongful act is coupled with some harm. "To set forth a viable claim for negligence, a plaintiff must allege, *inter alia,* 'damages.'" As we held in *Armstrong I,* a cause of action in an asbestos-related injury claim does not arise until the asbestos fibers inhaled into the lungs cause functional impairment. The Court's analysis in *Armstrong II* implies that such an injury occurs when the individual acquires the asbestos-related disease. Although the Court in *Armstrong II* did not have to determine precisely when the asbestos-related "injury" occurred, it obviously looked beyond the date when plaintiff was exposed to asbestos and determined instead, *when the earliest date of asbestosis would arise. Based on Armstrong and other case law discussed supra, the statutory cap is not applicable* to appellees' awards of noneconomic damages if their exposure to asbestos fibers caused them to develop mesothelioma prior to the effective date of the statutory cap, July 1, 1986.

*Grimshaw,* 115 Md.App. at 163, 692 A.2d 5 (citations omitted; emphasis added). Thus, contrary to appellant's assertion, it was *Armstrong II,* rather than *Peterson,* upon which we bottomed our decision in *Grimshaw.*

Additionally, to the extent that the Court of Appeals in *Armstrong II* was required to address the asserted "inherently questionable medical testimony," the Court acknowledged the difficulty in pinpointing the onset of latent asbestos-related disease. Nevertheless, the Court referred to *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 61–62, 595 A.2d 469 (1991), wherein it had considered the testimony

of a clinician, Dr. Epstein, and a pathologist, Dr. Craighead, and concluded that when the latent disease comes into existence is a determination to be made based on the expert testimony provided.

### The Decision in Buttram

Appellant relies heavily on the decision of the Supreme Court of California in which that court was called upon to construe California's Civil Code Section 1431.2, enacted by Proposition 51. The law provided that a cause of action for damages arising from the latent and progressive asbestos-related disease mesothelioma has "accrued," for purposes of determining whether Proposition 51 can be prospectively applied, if the plaintiff was diagnosed with the disease for which damages are sought or otherwise discovered his illness or injury prior to Proposition 51's effective date of June 4, 1986. Notably, in discussing respondent Buttram's reliance on the decision of the Maryland Court of Appeals in *Armstrong II,* the *Buttram* court explicitly distinguished the issue before it and that before the Court in *Armstrong II,* explaining: "At issue in *Owens–Illinois* was Maryland's statutory cap on noneconomic damages which, by its express terms, was made applicable 'in any action for damages for personal injury in which the cause of action *arises* on or after July 1, 1986 . . . .' " *Buttram,* 66 Cal.Rptr.2d 438, 941 P.2d at 82.

The *Buttram* court continued, observing that the Maryland Court of Appeals had

> reject[ed] [Owens–Illinois's] argument that the discovery rule, used to establish accrual in the statute of limitations context in asbestos-related latent injury cases in [Maryland] . . . should likewise be utilized to determine accrual for purposes of applying the . . . statutory cap, the [Court of Appeals] concluded the statutory cap did not apply to a preexisting asbestosis condition although it was not diagnosed until *after* the statute's effective date.

*Id.,* 66 Cal.Rptr.2d 438, 941 P.2d at 82 (citations omitted). *Buttram* undermines Owens Corning's argument in two respects. First, much of the analysis devolves upon a consider-

ation of lack of language manifesting the intent of the drafters of the initiative measure (Proposition 51) and the lack of indicia that the electorate considered the prospective versus retrospective application of Proposition 51. Thus, as a threshold matter, the California Supreme Court decided that no intent could be gleaned from the language or legislative history of the statute in question. C.J. § 11–108(a)(2) employs language, "in which the cause of action arises," which has been construed by Maryland courts.

Second, as a matter of statutory construction, the *Buttram* court accorded special significance to the fact that the issue before it was unlike that before the Maryland Court of Appeals which was required to determine the definition of the term "arises." Observing that the *"Owens–Illinois* court's holding appears to have *turned to a large extent on the express wording of the statute* there under scrutiny," the Supreme Court of California concluded:

> Focusing on the term "arises," the court applied the rule of statutory construction that would give that term its ordinary meaning, found that a cause of action *"arises when it first comes into existence,"* and therefore determined that the *subclinical harm to the cells and tissues of the lungs caused by the disease asbestosis during its lengthy latency period was sufficient to establish that a cause of action had "arisen" within the meaning of the statute's language.* . . .
> Here, in contrast, Civil Code section 1431.2, enacted by Proposition 51, *contains no similar controlling language.*

*Buttram,* 66 Cal.Rptr.2d 438, 941 P.2d at 82 (citations omitted; emphasis added).

*Buttram* ultimately distinguishes *Armstrong II* on the basis that the Court of Appeals had not considered "analogous policy considerations and purposes to be served in adopting an accrual rule that determines the applicability of a . . . statute such as Proposition 51." *Id.* Thus, *Buttram* holds that there should only be resort to the diagnosis/discovery of actual injury standard in the context of determining when a noneconomic statutory cap is applicable, because examination of the

language of the California statute itself—unlike the Maryland statute—is unavailing.

■ As appellee points out and *Buttram* recognizes, we must presume that employment of the term "arises," was deliberate, and there can be little doubt that "accrual" of a cause of action involves a different analysis. A claim "arises" when all of the elements of a claim first come into existence. *Armstrong II*, 326 Md. at 121, 604 A.2d 47. A claim accrues when the victim "ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his [or her] injury." *Id.* at 120–21, 604 A.2d 47. The Court of Appeals held, in *Armstrong II*, that a cause of action arises for the purposes of the cap statute when the victim suffers injury, but a cause of action accrues only when the injury is discovered. *Id.* Assuming, without deciding, that adoption of a diagnosis/manifestation of symptoms approach would be less speculative as suggested by appellant, such an approach would require us to hold that a cause arises and accrues at the same time. The ordinary meaning of "arises" is when the cause of action "comes into existence." *Buttram*, 66 Cal.Rptr.2d 438, 941 P.2d at 82, citing *Armstrong II*, at 107, 604 A.2d 47. The Maryland Court of Appeals explicitly delineated the meaning to be assigned "arises" in *Armstrong II*:

> Owens–Illinois asks this Court to hold that a cause of action "arises" when it is discovered as opposed to when it comes into existence. In construing the CAP statute, "we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary." ... According to Webster's New World Dictionary (2d ed.) the word "arise" means "to come into being; originate." Giving the word its ordinary meaning, we believe that a cause of action *arises* when it first comes into existence.

*Armstrong II*, 326 Md. at 107, 604 A.2d 47 (citation omitted).

Thus, the approach advanced by Owens Corning is at odds with the most fundamental principle of statutory construction as well as with *Armstrong II, Oxtoby v. McGowan, supra,* and

other decisions of Maryland appellate courts that have considered the issue.

 Ancillary to an examination of the language of the statute in divining legislative intent is a consideration of the actions of the legislature subsequent to court decisions construing when a cause of action "arises" for purposes of the statutory cap. *Armstrong II*, holding subclinical harm to cells and tissues of the lungs was sufficient to establish that a cause of action had arisen, was decided in 1992. Four years after the decision of the Court of Appeals in *Armstrong II*, the General Assembly amended the noneconomic cap statute, increasing the limit to $500,000 and extending its application to wrongful death claims. With full knowledge of the construction of "arises" by the Court of Appeals in *Armstrong II*, the legislature amended the statute, leaving intact the term, "arises."[5] Clearly, the General Assembly has had and continues to have within its province the authority to modify the statute, requiring that manifestation of symptoms or diagnosis be the determining event as to which cases the cap applies.

Finally, the Maryland Court of Appeals has been presented with the opportunity on several occasions[6] to revisit its deci-

---

**5.** It would have been—and continues to be—a simple matter for the legislature to insert the following definition in C.J. § 11–108: "A disease 'Arises,' for purposes of this section, when it is diagnosed or manifests symptoms or when an injured party has been impaired in his or her ability to perform normal functions." Indeed, illustrative of curative legislation is the enactment of C.J. § 11–108(d)(1) forbidding informing the jury of the existence or amount of the statutory cap. This supplement was intended to make clear that the United States District Court for the District of Maryland had incorrectly construed the language of C.J. § 11–108 in *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325, 1328 (D.Md.1989), when it held that the jury should be instructed not to award economic damages in excess of $350,000.

**6.** See *ACandS, Inc. v. Abate, supra; Owens Corning v. Brannan, cert. denied*, 349 Md. 497, 709 A.2d 141 (1998); *Anchor Packing Co. v. Grimshaw, supra; ACandS v. Asner*, 104 Md.App. 608, 657 A.2d 379 (1995), *rev'd on other grounds and remanded*, 344 Md. 155, 686 A.2d 250 (1996). The Court of Appeals has not acted on petitions for *certiorari* in *Adams v. Owens–Illinois, Inc.*, 119 Md.App. 395, 705 A.2d 58 (1998) or *Ford Motor Co. v. Wood*, 119 Md.App. 1, 703 A.2d 1315 (1998).

sion in *Armstrong II*, but instead has chosen to allow its designation of the event, which governs in applying the cap, to stand.

### Grimshaw/Abate/Ford

Appellant posits that there is an inconsistency between recent decisions of this Court interpreting what constitutes a legally compensable injury. Appellant's argument is as follows:

> Under Owens' Corning's interpretation, adopted in *Abate,* the determination of when a cause of action "arises" is straightforward and will produce uniform, easily understood and predictable results, because a claim will arise only upon the manifestation of symptoms of a latent disease or the clinical diagnosis of that latent disease.... Under [appellee's] interpretation, adopted in *Grimshaw,* the determination of when a claim "arises" will not be straightforward or consistent, because it will depend in each case on a question of fact—the date of onset of mesothelioma (or any other latent disease)—that is scientifically unknowable.

Consequently, appellant urges that, because of these alleged inconsistencies, we should overrule *Grimshaw* and adopt the "straightforward" manifestation standard. Appellee rejoins that "[Owens Corning's] attempt to claim that *Grimshaw* and *Abate* are inconsistent is specious [because] [b]oth cases apply the same standard in determining the applicability of the Cap Statute." Our resolution of this issue requires us to analyze *Grimshaw* and its progeny, *Ford Motor Co. v. Wood,* 119 Md.App. 1, 703 A.2d 1315 (1998) (*Ford* ), and *ACandS, Inc. v. Abate,* 121 Md.App. 590, 710 A.2d 944, *cert. denied,* 350 Md. 487, 713 A.2d 979 (1998) (*Abate* ), to reconcile these three decisions.

In *Grimshaw,* we concluded that a "legally cognizable wrong arises when a negligent act is coupled with some harm." *Grimshaw,* 115 Md.App. at 159, 692 A.2d 5. Quoting *Armstrong I* and the Restatement (Second) of Torts, we stated:

[S]ections 388 and 402A of The Restatement (Second) of Torts (1965) identify "harm" as one of the necessary elements of a cause of action in both negligence and strict liability. The Restatement, in Section 7(2), defines "the word 'harm' as used throughout the Restatement ... to denote the existence of loss or detriment in fact of any kind to a person resulting from a cause." Comment b to section 7 further explains that " 'harm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing. . . ."

*Id.* at 158, 692 A.2d 5 (quoting *Armstrong I,* 87 Md.App. at 734, 591 A.2d 544). Applying these principles to the facts in *Grimshaw,* we held that

an injury occurs in an asbestos-related injury case when the inhalation of asbestos fibers causes a legally compensable harm. Harm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer. We, therefore, reject ... that the injury or harm does not arise until the symptoms of the disease become apparent.

*Id.* at 160, 692 A.2d 5, *quoted in Ford,* 119 Md.App. at 48, 703 A.2d 1315. Therefore, regarding an asbestos-related injury case, our holding was that a legally compensable harm is not cognizable until cellular changes develop into either an injury or disease. The cause of action arises at "the time at which the impairment occurred." *Id.* at 163, 692 A.2d 5.

Less than one year later, in *Abate,* this Court again was confronted with the question of when an asbestos-induced injury or disease "arises" for purposes of the statutory cap on noneconomic damages. Appellant postulates, concerning our holding in *Abate,* "that the enforceability of the cap turns on the manifestation of symptoms, an easily verifiable point in time. This Court should discard the unsound *Grimshaw* standard in favor of the clear manifestation standard set forth in *Abate* and adopted by the Supreme Court of California." Appellant, however, misinterprets *Abate,* which followed the standard reiterated in *Grimshaw.* In fact, *Abate* relied upon the *Grimshaw* determination of when a cause of action arises

in an asbestos-related injury claim. In quoting our earlier decision, we recalled: "In Maryland, the injury element of a negligence claim is satisfied when a wrongful act is coupled with some harm.... *A cause of action in an asbestos-related injury claim does not arise until the asbestos fibers inhaled into the lungs cause functional impairment."* Abate, 121 Md.App. at 695, 710 A.2d 944 (quoting *Grimshaw*, 115 Md. App. at 163, 692 A.2d 5).

The day after we issued our opinion in *Abate*, January 8, 1998, we issued *Ford* and addressed the issue of legally compensable harm yet again. We discussed in *Ford* the apparent conflict between whether an asbestos-related injury becomes compensable when there is a functional impairment of the lungs or, before a disease is diagnosable, when the inhalation of asbestos fibers first causes injury to cells and tissue. *See Ford*, 119 Md.App. at 45, 703 A.2d 1315. The appellant in *Ford* urged us to overrule *Grimshaw*, predicting that its analysis "invites disaster in the near future." *See id.* at 48, 703 A.2d 1315. The appellant's concern was that *Grimshaw's* holding regarding when a legally compensable injury arises would be difficult to apply if a diagnosis concluded that an individual's "injury" first arose in July 1986. We disagreed with appellant, however, and concluded that, "[u]nder *Grimshaw*, we will uphold a trial court's determination of when an injury arises as long as that determination is supported by legally sufficient evidence." *Id.* (citing *Grimshaw*, 115 Md.App. at 165, 692 A.2d 5).

In summarizing the standard from *Grimshaw*, our discussion observed that "[w]e chose to rely upon a determination of the date that an injury in fact came into existence, and rejected defendants' contention that such an approach was too speculative...." *Ford*, 119 Md.App. at 47–48, 703 A.2d 1315. Immediately following, we quoted the standard enunciated in *Grimshaw* as being controlling in Maryland. Consequently, we agree with appellee's assertion that *Grimshaw's* pronouncement that "[h]arm results when the cellular changes develop into an injury or disease" is the standard used in both *Ford* and *Abate* to determine when a cause of action based on

an asbestos-related harm arises. Our decision in *Ford* contradicts appellant's contention that inconsistent standards have developed in Maryland for determining legally compensable harm.

Although these decisions are in harmony regarding the applicable standard, differences among the three cases exist. The issue addressed in *Grimshaw*, and applied in *Ford* and *Abate*, involves the distinctive characteristics of the asbestos-related *diseases*, asbestosis and mesothelioma, as compared to the *condition* known as pleural plaques. Dispositive are the different points in time that a legally compensable harm arises when a plaintiff has pleural plaques as opposed to either of the diseases, mesothelioma or asbestosis.

In *Grimshaw*, we reviewed the medical condition known as pleural plaques:

> "Pleural plaques and thickening result from the scarring of the pleura, the thin membrane that keeps the lungs contained and configured to the chest wall and diaphragm." Medical experts agreed that pleural thickening and plaques are an alteration of an otherwise healthy pleura, but do not constitute any loss or detriment. In addition, the medical experts testified that pleural plaques do not cause any pain and have no health significance.

*Grimshaw*, 115 Md.App. at 158, 692 A.2d 5 (citation omitted). Although there is alteration of the pleura, this change is not an injury and has no health significance. Consequently, "[m]ere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone is not a functional impairment or harm, and therefore, do not constitute a legally compensable injury." *Id.* at 159, 692 A.2d 5. Although pleural plaques are merely changes in the body that only become "injury" if symptoms develop, mesothelioma and asbestosis are diseases that constitute compensable harm upon contraction.[7]

---

7. Appellee correctly summarized the distinction between mesothelioma and pleural plaques:

■ As we stated in *Grimshaw*, a " 'cause of action arises' under the statutory cap . . . when it first comes into existence, as distinguished from when a cause of action accrues." *Id.* at 155, 692 A.2d 5. Each of the elements of a claim must be met before a cause of action arises and, as discussed previously, in Maryland, a negligent act must be coupled with some harm. *See id.* at 163, 692 A.2d 5. In the context of an asbestos-related disease, the cause of action arises before the disease is diagnosed. *See id.* at 156, 692 A.2d 5. Because of the latent nature of the disease, the requisite elements exist before diagnosis or symptoms develop. Therefore, there is a distinction between disease and injury as to when harm first exists in an asbestos-related case. This distinction does not make the *Grimshaw* standard, as appellant contends, arbitrary or inconsistent. Instead, a trial court in hindsight may use the plaintiff's state of health, whether it be a disease or the pleural plaque condition, to compute when the harm and cause of action first arose.

*Abate* merely applied the distinction from *Grimshaw* between a plaintiff who contracted the disease of asbestosis or mesothelioma and a plaintiff who suffered from the pleural plaque condition. This Court stated that "the condition known as pleural plaques, or even generalized pleural thickening, *unaccompanied by disabling consequences or physical impairment,* is not a compensable injury as a matter of law." *Abate,* 121 Md.App. at 666, 710 A.2d 944. *Abate* did not change *Grimshaw's* reasoning that "[h]arm results when the cellular changes develop into an injury or disease." *Grimshaw,* 115 Md.App. at 160, 692 A.2d 5. In *Abate,* the plaintiff Ciotta did not contract asbestosis or mesothelioma. Conse-

---

A person diagnosed with mesothelioma has suffered a real and immediate injury which was inflicted when the cancer cells first began growing in his body—even though the person was not aware of that injury until the cancer was diagnosed. By contrast, a person who is merely diagnosed with pleural plaques has no present loss, detriment, impairment or injury.

*Grimshaw,* 115 Md.App. at 158, 692 A.2d at 17. Without loss, detriment, impairment, injury, or health significance, a person's pleural plaques do not support a cause of action.

quently, no legally compensable harm occurred until the plaintiff exhibited symptoms as a result of the pleural plaque condition because there is no impairment until the symptoms arise. In *Grimshaw,* on the other hand, the plaintiff contracted mesothelioma, and the legally compensable harm arose at the time of contraction because the disease was fatal and irreversible at that point in time. *Abate* and *Grimshaw* are not inconsistent concerning the standard for when a legally compensable harm occurs; rather, they were factually distinguishable because the plaintiffs did not suffer the same type of impairment and, therefore, the "harm" occurred at different stages of their cellular changes.

In *Ford,* the appellant argued that only upon the date that the appellee began experiencing symptoms of asbestosis did the appellee's cause of action arise. Again, we rejected this argument and relied upon *Grimshaw* for the proposition that a legally compensable injury is recognizable on "the date that an injury in fact came into existence." *Ford,* 119 Md.App. at 47–48, 703 A.2d 1315. *Ford* also reasoned that, in conjunction with *Grimshaw,*

> [t]he injury must be one that the law recognizes as compensable. If certain anatomical changes occur in a person as a result of a latent process, in some instances, the appearance of symptoms will make the condition a legally compensable injury. By contrast, a condition such as cancer is a compensable injury when it comes into existence even without symptomatology.

*Id.* at 45 n. 11, 703 A.2d 1315. *Ford* followed *Grimshaw's* holding concerning when a legally compensable injury arises and, therefore, is not inconsistent with either *Grimshaw* or *Abate.*

The California Court of Appeal, First District, succinctly summarized the dilemma regarding the onset of harm in an asbestos-related situation:

> The analytic difficulty in these cases is that the point at which compensable harm has been suffered will always have to be evaluated in retrospect. According to expert testimo-

ny given in this case, *an individual will not be diagnosable with mesothelioma for some 10 to 15 years after his cells have embarked upon an irreversible progression towards the disease, which is invariably fatal.* At the point of that initial cellular change, the individual has experienced no symptoms and, because he is unaware of his condition, has suffered no associated emotional distress or compensable fear of cancer.

*Peterson,* 50 Cal.Rptr.2d at 907 (emphasis added).[8] When a plaintiff actually contracts an asbestos-related *disease,* the legally compensable harm may be retraced to the first moment of cellular change; however, when a plaintiff contracts the *condition* of pleural plaques, the legally compensable harm only arises with the onset of a symptom. Therefore, the standard for determining harm is uniform, but an "injury" does not arise until symptoms are manifested while the harm for a fatal and irreversible "disease" arises as soon as the cellular change develops. Our recent decisions in *Ford* and *Abate* have followed the *Grimshaw* standard and, accordingly, Maryland law is clear as to when an asbestos-related injury becomes a legally compensable harm.

In sum, mere exposure, without cellular change, does not constitute an injury or harm for which one may maintain a cause of action. Furthermore, cellular change without accompanying injury does not constitute harm or functional impairment that would give rise to a cause of action. For purposes of the statutory cap, the crucial distinction is whether a plaintiff's cellular change develops into an asbestos-related *disease* or simply into an asbestos-related *condition.*

When cellular change later results in an asbestos-related disease, the harm was irreversible from the time of contraction, and the "injury" as well as the cause of action arose when the disease came into existence. Consequently, the presence or absence of symptomatology is irrelevant for

---

**8.** As we have observed earlier, *see supra* n. 2, *Buttram* overruled *Peterson,* but this excerpt is not affected by the status of *Peterson.*

purposes of the statutory cap, because the cause of action arose when the disease was contracted. On the other hand, when a plaintiff becomes afflicted with an asbestos-related condition, such as pleural plaques, it is not until symptomatology is present that any functional impairment occurs. Therefore, when a plaintiff develops an asbestos-related *condition*, the statutory cap only is triggered upon the presence of symptoms, because there is no harm until the symptoms arise. In the case *sub judice*, however, appellee developed an asbestos-related *disease* and the irreversible harm arose when the disease came into existence.

### Requirement of Physical Impairment

Both Owens Corning and amicus Maryland Defense Counsel insist that, to state a cause of action for damages, Maryland law requires a plaintiff to suffer a legally compensable injury in the form of symptoms or impairment of a person's ability to function normally. Citing *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), amicus argues that there is no cause of action under the Federal Employer's Liability Act (FELA) in tort until a plaintiff has suffered identifiable, compensable injury. Significantly, Maryland Defense Counsel, characterizing its quotation from *Schweitzer* as, "what has become a landmark passage," states:

> It is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist. Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." We believe, however, that subclinical injury resulting from asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principals of tort law.
>
> Moreover, we are persuaded that a contrary rule would be undesirable as applied in the asbestos-related tort context. If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly

healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of the tort law: the compensation of victims who have suffered.

*Id.* at 942.

■■■ Maryland Defense Counsel, in reliance on this excerpt, posits that people who have experienced "no pain, no suffering, no inconvenience, and no loss of bodily function and who are not even aware that they may have subclinical cellular changes have, by definition, not suffered and, therefore, are not entitled to compensation." The reliance upon *Schweitzer* and other cases [9] cited by amicus misses the mark. The

---

**9.** *See Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (holding that plaintiff can be held to be injured only when the accumulated effects of the deleterious substance manifest themselves); *In the Matter of Reading Co.,* 115 F.3d 1111, 1121 (3d Cir.1997) (holding that "identifiable, compensable injury [is] a basic element of a tort claim" and a tort claim does not exist until plaintiff's injuries become manifest); *In the Matter of Central R.R. Co.,* 950 F.2d 887, 892 (3d Cir.1991) (holding that the date of legal injury is "not the point at which a 'creeping disease' crosses the invisible line between potential and actual harm but rather the moment at which the harm is sufficient to put a claimant on notice that his or her rights have been invaded"), *cert. denied,* 503 U.S. 971, 112 S.Ct. 1586, 118 L.Ed.2d 305 (1992); *Jackson v. Johns–Manville Sales Corp.,* 781 F.2d 394, 412 n. 22 (5th Cir.) (stating that subclinical injury is insufficient to constitute the loss or damages required to sustain a cause of action under generally applicable principles of law), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563 (D.Haw.1990) (holding that, frequently, persons claiming damages from exposure to asbestos reflect no objectively verifiable disablement which is traditionally the basis of tort litigation); *Friedman v. F.E. Myers Co.,* 706 F.Supp. 376, 379 (E.D.Pa.1989) (holding that there is generally no cause of action in tort until a plaintiff has suffered identifiable, compensable injury); *Amendola v. Kansas City So. Ry. Co.,* 699 F.Supp. 1401, 1406 (W.D.Mo.1988) (holding that the rationale that there is no claim under FELA for increased risk of future disease without present manifestation of physical injury is consistent with the

quotation from *Schweitzer* itself contains, as part of its rationale, the fact that "countless seemingly healthy railroad workers ... who might never manifest injury" would have tort claims cognizable in federal court. This rationale is the antithesis of the decision in *Armstrong II*, which specifically addresses the Third Circuit's concern in *Schweitzer* that the workers might never manifest injury:

> *Fortunately, we have the benefit of hindsight in determining whether Armstrong's cause of action existed prior to 1986.* We now know that in 1987 Armstrong was diagnosed as having asbestosis, and we agree with the Court of Special Appeals'[s] conclusion that "[i]t is inconceivable that Armstrong's asbestosis came into existence between July 1, 1986 and his medical examination in May 1987."

*Armstrong II*, 326 Md. at 123, 604 A.2d 47 (emphasis added). Thus, the very excerpt from *Schweitzer* set forth by amicus Maryland Defense Counsel to support the manifestation standard highlights the distinction between diseases that inevitably come into existence and conditions that may not develop into disabling or fatal diseases. More important, however, most of these cases do not involve attempts to fix a particular point in time after which statutorily imposed limitations apply.

---

weight of authority on this issue and with general principles of law because an individual must suffer actual loss or damage to recover for the negligent acts of another); *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (Pa.1996) (holding that either symptoms or physical impairment is required to state a cause of action for damages thus denying recovery for asymptomatic pleural thickening); *Caterinicchio v. Pittsburgh Corning Corp.*, 127 N.J. 428, 605 A.2d 1092 (N.J.1992) (holding that the court had found no case supporting the proposition that asymptomatic pleural thickening or pleural plaques constitutes a compensable injury as a matter of law and noting the substantial authority to the contrary); *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 543 (Me.1986) (holding that a judicially recognizable claim does not arise until there has been a manifestation of physical injury to a person, sufficient to cause him actual loss, damage, or suffering from a defective, unreasonably dangerous product in an action involving asbestos-related injuries); and *Bendix Corp. v. Stagg*, 486 A.2d 1150, 1151 (Del.1984) (holding that an injury in an asbestos case is sustained when the harmful effect first manifests itself and becomes physically ascertainable).

Thus, the uncertainty of which *Schweitzer* is concerned is whether there can be a legally cognizable cause of action for a subclinical condition irrespective of whether it will result in symptoms or the impairment of the ability of plaintiffs to perform normal functions. These decisions, cited by Maryland Defense Counsel and Owens Corning, address whether a plaintiff has a cause of action for which he can seek relief. The ability of the fact finder to assess damages, of course, is essential to a proper adjudication of any tort claim. The point in time when the statutory cap is applicable in no way implicates the essential elements (including injury and resultant damages) that must be extant in order to pursue a civil remedy because, as *Armstrong II* points out, in a determination of application of the cap, we only consider cases in which the plaintiff already has suffered physical impairment and thus "we have the benefit of hindsight in determining whether [the] cause of action existed prior to 1986." *Armstrong II*, 326 Md. at 123, 604 A.2d 47.

Thus, the central issue that *Schweitzer* and most of the other decisions cited, approving the manifestation standard, are concerned with is when all the elements are in place in order for an aggrieved party to seek relief in a civil proceeding. The point in time when one may seek relief is no longer an issue in cases in which, not only has the cause of action already accrued, but both liability and damages have been decided and the only matter left for determination is whether those damages will be rolled back, pursuant to the statutory cap. In the first instance, the inquiry addresses the ripening of a cause of action; in the other instance, the inquiry concerns the retrospective limitation of damages in a cause of action already pursued and for which damages exceeding the statutory maximum have been awarded. Notwithstanding the aforegoing, the short answer to when the cap is applicable is that that determination is to be made in accordance with the act of the legislature and any change in that act is most appropriately addressed to that body.

### Public Policy

Owens Corning and amicus next argue, "These [policy concerns] include the difficulties the 'subclinical injury' standard poses for judges and juries to administer, the resulting inconsistency of verdicts, and the tax of a trial within a trial—or battle of the experts—as to when the first subclinical changes that result in a disease took place."

### A

Citing *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423 (1995), and the Report of the Governor's Task Force to Study Liability Insurance, Owens Corning states that the General Assembly's express purpose in enacting the noneconomic damages cap was to make damage awards more predictable. Similarly, amicus Maryland Defense Counsel argues that adoption of a "manifestation" standard in all latent disease cases furthers a primary purpose of the General Assembly in enacting the noneconomic damages cap, i.e., decreasing unpredictable and speculative damage awards. Amicus further claims that, for a law to have "any meaning at all," a law must have certainty of outcome and consistency of results.

Appellee responds that the rationale for the cap statute "is inapplicable to latent disease cases where the events giving rise to disease occurred decades ago," as the insurance for those claims was purchased long before the cap statute was enacted. Appellee concludes that, because asbestos products have not been in production for many years, there is no need for companies to buy additional insurance and, thus, even if there were some questions regarding whether the cap statute applied to latent disease cases, that fact would not undercut the purpose of the legislation.

The Court of Appeals, in *Murphy v. Edmonds*, 325 Md. 342, 368–69, 601 A.2d 102 (1992), recounted the considerations underlying the enactment of the cap statute:

> Section 11–108 was enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. This crisis resulted in the

unavailability of liability insurance for some individuals and entities, especially those engaged in hazardous activities such as asbestos removal, and increasing difficulty in obtaining reinsurance. *See Report of the Governor's Task Force to Study Liability Insurance,* 3–4 (Dec.1985). The crisis also affected the medical profession, resulting in excessive insurance premiums for doctors and declining services for patients, especially in high risk specialties such as obstetrics. *See Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance,* 5 (Dec.1985).

In considering whether to enact the cap on tort damages, the General Assembly had before it the above-cited task force reports, both of which advocated a $250,000 cap on noneconomic damage awards. *See Report of the Governor's Task Force to Study Liability Insurance, supra,* at 10–13; *Report of the Joint Executive/Legislative Task Force on Medical Malpractice Insurance, supra,* at 28–29. Neither task force believed that the cap should be extended to economic damages. *Ibid.* The *Report of the Governor's Task Force to Study Liability Insurance* stated that the cap would lead to greater predictability of damage awards, thus making the insurance market more stable and attractive to underwriters. The Report also noted that noneconomic damages are "impossible to ascertain with precision and are subject to emotional appeals to a jury," so that a $250,000 cap would permit a more realistic recovery in this area. *See Report of the Governor's Task Force to Study Liability Insurance, supra,* at 11.

(Footnote omitted.)

The Court went on to observe that the General Assembly had received numerous letters and petitions supporting enactment of the cap from the public at large who feared that an insurance crisis would result in reduced availability of medical services and from members of the medical profession concerned about high insurance premiums. *See id.* at 369, 601 A.2d 102. The General Assembly also had reports urging adoption of the cap by interest groups, including The Business Round Table and The Tort Policy Working Group. *See id.*

The legislature also considered existing and proposed tort reform and liability insurance legislation in all fifty states before enacting the cap. *See id.*

The Court of Appeals declared the statute's express purpose:

> The General Assembly's objective in enacting the cap was to assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public. This is obviously a legitimate legislative objective. A cap on noneconomic damages may lead to greater ease in calculating premiums, thus making the market more attractive to insurers, and ultimately may lead to reduced premiums, making insurance more affordable for individuals and organizations performing needed services. The cap, therefore, is reasonably related to a legitimate legislative objective. *See, e.g., Davis v. Omitowoju, supra,* 883 F.2d [1155] at 1158 [(1989)] ("Clearly the ... decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care ... provides a rational basis for capping the amount of damages that can be awarded a plaintiff"); *Hoffman v. United States, supra,* 767 F.2d [1431] at 1437 [(1985)] (the "Legislature had a 'plausible reason' to believe that the limitations on noneconomic recovery would limit the rise in ... insurance costs")....

*Id.* at 369–70, 601 A.2d 102.

From the above, predictability of damage awards and concerns about the availability of liability insurance were considerations leading to the enactment of C.J. § 11–108. It would be disingenuous for us, or appellee, to portend otherwise. Whether the legislature believed predictability and availability of liability insurance could best be achieved by an "onset" test rather than a "manifestation" standard is yet another matter.

It is also clear, however, from the above, that many interest groups lobbied the legislature for the enactment of the cap statute, but we must assume, as well, that other interest groups just as vehemently opposed its enactment. It was in

that arena that the policy considerations regarding the statutory cap should have been debated and resolved.

While appellant and amicus Maryland Defense Counsel make much of the clearly expressed purposes as recounted in *Murphy v. Edmonds*, it follows that how the cap should be implemented was part and parcel of the process leading to its enactment and, considering what was apparently an extensive and thorough review of submissions from all sides, the General Assembly employed language it felt would achieve those purposes. The Court of Appeals, in *Armstrong II*, has construed that language and, the General Assembly, although having amended the statute, nevertheless has decided not to disturb the judicial construction of "arises" in *Armstrong II*.

## B

Owens Corning next contends that, "given the understandable lack of any medical consensus, various medical experts have given and will continue to give disparate opinions, but these opinions will not be grounded in the facts of the particular plaintiff's disease." Echoing these sentiments, amicus Maryland Defense Counsel proclaims, "under a 'subclinical injury' standard, unpredictability and uncertainty will be the natural consequence of a case-by-case battle of the experts of when a disease first appeared." Maryland Defense Counsel alludes to what it considers the "scientific unsoundness of that standard" by pointing out that three experts rendered different opinions in *Grimshaw*, divergent testimony existed between Drs. Hammar and Gabrielson in the instant case, and that different opinions were rendered by Dr. Hammar in the case *sub judice* and another case, *Baltimore City v. Walatka* [No. 385, Sept. Term, 1998], presently pending on appeal before us.

Appellee rejoins that Dr. Hammar consistently has testified that it is impossible to give "hard and fast opinions" as to the precise date that mesothelioma begins to develop within a given patient. Appellee adds that sufficient information exists to conclude generally that appellee's cancer began to develop

at least ten years prior to its clinical diagnosis. Dr. Hammar's conclusion is strikingly similar to the approach employed by the Court of Appeals in *Armstrong II:*

> We need not decide exactly when Armstrong contracted asbestosis. Given that Armstrong was exposed to large amounts of asbestos from 1943 to 1963, his asbestosis probably had its genesis relatively early in the course of his exposure.
>
>> Owens–Illinois'[s] expert testified that
>>
>> "asbestos does not develop immediately after exposure. It takes many, many years, and usually the kind of latency period that we are talking about is probably at the minimum 15 years but more ordinarily 20 or more years. During unusual circumstances less than that could cause the disease."
>
> Based on Owens–Illinois'[s] expert's testimony, it is reasonable to assume that Armstrong's asbestosis took approximately twenty years to develop. Since his exposure began in the early 1940's, the most reasonable conclusion is that his asbestosis developed at least by the mid–1960's. Even assuming that the initial damage to Armstrong occurred in 1963, the last year in which he worked in the shipyards, the disease "ordinarily" would have developed by 1983 and under "unusual" circumstances even earlier. The only reasonable conclusion, even viewed in the light most favorable to Owens–Illinois, is that Armstrong had asbestosis prior to July 1, 1986.

*Armstrong II,* 326 Md. at 123–24, 604 A.2d 47. Admittedly, although the determination that Armstrong had contracted asbestosis prior to July 1, 1986 was reached as a result of testimony fraught with some imprecision, the Court of Appeals, at least implicitly, has given its *imprimatur* to basing the date of onset on less than definitive expert opinion.

Amicus White Lung Association (White Lung) invites our attention to a deposition of Grover Hutchins, M.D. (whom White Lung asserts is an expert witness for Owens Corning) wherein the deponent indicated that the Ohio plaintiff had

developed a mesothelioma "probably in the ten or fifteen year range" prior to its diagnosis. Citing a myriad of treatises from the medical community, amicus White Lung Association refers to "a tumor doubling time" in an attempt to support its assertion that there is a general consensus in the medical community as to the growth rate and the metasticism of tumors. After a discussion of the length of the subclinical induction period to distinguish between remission and "complete curing" and what it asserts is the established scientific methodology designed to quantify the doubling times of clinical tumors, amicus White Lung concludes that mesothelioma has a measurable doubling time.

Notwithstanding the exhaustive compendium of articles and treatises referenced by amicus White Lung, there can be no dispute that, as we said in *Grimshaw*, 115 Md.App. at 161, 692 A.2d 5 (quoting *Peterson*, 50 Cal.Rptr.2d at 909), "the test we set forth here will in most, if not all, cases require the testimony of medical experts." We are not convinced, however, that this "battle of the experts" is any more deleterious or savages resources any more than the countless other instances in which litigants rely on expert testimony to establish essential elements of their causes of action or defenses. (*See*, for example, *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.*, *supra.*)

## C

 Citing *Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997), appellant and amicus Maryland Defense Counsel contend that a reason underlying the Supreme Court's adoption in *Buckley* of a manifestation standard for FELA claims for emotional distress was the "special 'difficulty for judges and juries' in separating valid, important claims from those that are invalid or 'trivial.'" *Buckley*, 521 U.S. at 433, 117 S.Ct. 2113 (quoting *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 557, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994)).

The gravamen of this contention is that judges and juries are not qualified to make determinations requiring the processing of highly technical scientific data that appellant and amicus assert are "scientifically uncertain at best, and scientifically unknowable at worst." The precise issue the Supreme Court decided is critical in placing the holding in *Buckley* in the proper context:

> The critical question before us in respect to Buckley's "emotional distress" claim is whether the physical contact with insulation dust that accompanied his emotional distress amounts to a "physical impact" as this Court used that term in *Gottshall*. In *Gottshall*, an emotional distress case, the Court interpreted the word "injury" in FELA § 1, a provision that makes "every common carrier by railroad ... liable in damages to any person suffering injury while ... employed" by the carrier if the "injury" results from carrier "negligence." 45 USC § 51.

*Buckley*, 521 U.S. at 428–29, 117 S.Ct. 2113. The Supreme Court ultimately held:

> *Yet, given the difficulty of separating valid from invalid emotional injury claims,* the evidence before us may typify the kind of evidence to which parties and the courts would have to look.

> The Court in *Gottshall* made a similar point:

> "[T]esting for the 'genuineness' of an injury alone ... would be bound to lead to haphazard results. Judges would be forced to make highly subjective determinations *concerning the authenticity of claims for emotional injury,* which are far less susceptible to objective medical proof than are their physical counterparts. To the extent the genuineness test could limit potential liability, it could do so only inconsistently." 512 U.S. at 552 [114 S.Ct. 2396].

And JUSTICE GINSBURG, too, in her opinion concurring in the judgment and dissenting in part, seems to recognize this problem, for she would limit recovery in emotional injury cases to those who can show more objective evidence

than simply having expressed fear and concern to supervisors.

More important, the physical contact at issue here—a simple (though extensive) contact with a carcinogenic substance—does not seem to offer much help in separating valid from invalid emotional distress claims. That is because contacts, even extensive contacts, with serious carcinogens are common.

*Id.* at 434, 117 S.Ct. 2113 (citations omitted; emphasis added). Thus, the *Buckley* Court simply concluded that a pipefitter, who had been exposed on his job to insulation dust that contained asbestos, but had suffered from no asbestos-related disease and had exhibited no physical symptom of exposure, could not recover damages under FELA for negligently inflicted emotional distress. The Court reached this conclusion because the "physical impact" referred to in *Consolidated Rail Corp. v. Gottshall,* which permitted recovery for negligent infliction of emotional distress, did not include a simple physical contact with a substance that might cause a disease at a substantially later time. In a nutshell, *Buckley* stands for the proposition that, under FELA, mere exposure to a carcinogen without proof of any underlying physiological basis of any real or threatened harm would not support a claim for negligently inflicted emotional distress.

The focus in *Buckley* was whether the exposure to asbestos, without more, constituted physical impact under *Gottshall.* This issue is patently distinguishable from the asserted difficulty in pinpointing the time at which an asbestos-related disease came into existence. Amicus Maryland Defense Counsel next cites several authorities [10]—including *Buttram*—intended to demonstrate how courts have expressed "difficulty in determining the date of onset in asbestos-related latent disease cases." As we observed *supra,* these cases, for the

---

**10.** *See Cole v. Celotex Corp.,* 599 So.2d 1058, 1066–67 (La.1992); *Porter v. American Optical Corp.,* 641 F.2d 1128, 1133 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *see also* H. WARD CLASSEN, *An Investigation into the Statute of Limitations and Product Identification in Asbestos Litigation,* 30 How. L.J. 1, 21 (1987).

most part, involve accrual of a cause of action, not when an irreversible disabling or fatal disease comes into existence.

In an attempt graphically to demonstrate its point, amicus sets forth excerpts from a pending asbestos proceeding in which Dr. Hammar acknowledged that "induction and promotion would be phases in carcinogenesis that you can't observe, so it's hard to have hard and fast opinions on when they occur." To be sure, it is with a certain degree of resignation that courts apply the subclinical standard. The Court of Appeals, in *Armstrong II*, observed: "Unfortunately, identifying the time at which an asbestos-related injury came into existence is usually not a simple task. Due to the latent nature of asbestos-related disease, experts and courts alike have had difficulty in pinpointing its onset." *Armstrong II*, 326 Md. at 122, 604 A.2d 47. Similarly, in *Grimshaw*, we quoted a passage from *Peterson* wherein the California Court of Appeal referred to "confusing and questionable medical testimony," uncertain outcomes, and "speculation [and] manipulation of facts." *See Grimshaw*, 115 Md.App. at 161, 692 A.2d 5 (quoting *Peterson*, 50 Cal.Rptr.2d at 909). As noted *supra*, the *Peterson* court concluded: "Of this parade of horribles, we agree that the test we set forth here will in most, if not all, cases require the testimony of medical experts." *Id.*

Notwithstanding the recognized difficulty in pinpointing the onset of a latent disease, the asserted inconsistency of verdicts, and how a legislative enactment affects a civil court proceeding, the difficulty of its implementation is a matter of policy. Like the recurring themes in Ravel's "Bolero" or Beethoven's "Fifth Symphony," we sound our refrain that C.J. § 11–108 is a legislative act. The law eschews invasion of the legislative prerogative in matters of public policy absent inherent authority to declare public policy. Many of the arguments of Owens Corning and amicus regarding implementation of C.J. § 11–108 are more properly addressed to the legislature, which could have, and still may, amend the law as to when a cause of action "arises."

Alternatively, matters of policy in the judicial arena are relegated to Maryland's highest court—the Court of Appeals. As we have noted, the Court of Appeals has been presented with several opportunities to revisit its decision construing "arises" in *Armstrong II* and has declined to do so. The manner in which to determine the point in time the statutory cap applies was spelled out in clear and unmistakable terms in 1992 in *Armstrong II*. Until and unless either avenue of redress available to appellant and amicus Maryland Defense Counsel is pursued, it is not within our purview to usurp the legislative function of the General Assembly or to overrule a decision of the Court of Appeals.

### Maryland Declaration of Rights and Maryland Constitution

Amicus White Lung Association, citing *Murphy v. Edmonds,* and acknowledging that "the Maryland cap statute has withstood previous constitutional challenges," argues "since the decision in those two cases [*Murphy v. Edmonds, supra,* and *Edmonds v. Murphy,* 83 Md.App. 133, 573 A.2d 853 (1990) ] numerous courts in other jurisdictions have addressed similar cap statutes and found those statutes unconstitutional on these or other grounds," and, therefore, we should consider their position and "restore to injured plaintiffs the right to obtain full compensation." This argument will not detain us long. Judge Eldridge, speaking for the Court of Appeals in *Murphy v. Edmonds,* concluded that, "[t]here is a distinction between restricting access to the courts and modifying the substantive law to be applied by the court," and that the cause of action based on negligence was not abolished by C.J. § 11–108, but rather simply "modifies the law of damages to be applied in tort cases." *Murphy,* 325 Md. at 366, 601 A.2d 102. The Court concluded that even if " § 11–108 were to be viewed as some degree of restriction upon access to the courts, it would be an entirely reasonable restriction," *id.* at 366–67, 601 A.2d 102, because "the legislative classification drawn by § 11–108 between tort claimants whose noneconomic damages are less than $350,000 and tort claimants whose noneconomic damages are greater than $350,000, and who are thus subject

to the cap, is not irrational or arbitrary." *Id.* at 370, 601 A.2d 102. We are satisfied that, contrary to amicus White Lung's assertion that circumstances have changed since the decision in the Court of Appeals in *Murphy v. Edmonds,* the reasoning of that decision is in no way affected by the constitutional arguments advanced by amicus White Lung. We therefore adopt the reasoning in *Murphy v. Edmonds* and rely on the discussion therein. *See* 325 Md. at 365–70, 601 A.2d 102.

## II. COMPETENCY OF EVIDENCE

With respect to the onset-of-disease *Grimshaw* standard, appellant contends that the only competent evidence compels a finding that appellee's cause of action arose after July 1, 1986 even under the *Grimshaw* standard. Its contention is grounded on the assertion that the testimony of appellee's pathology expert, Dr. Hammar, did not meet the *Frye/Reed* test and that Dr. Hammar's testimony was discredited because it had changed in contrast to the testimony of Dr. Gabrielson's, which Owens Corning contends was consistent.

The admission of expert testimony regarding a new scientific technique depends on whether the technique is "generally accepted as reliable within the expert's particular scientific field." *Reed v. State,* 283 Md. 374, 381, 391 A.2d 364 (1978) (citing *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)). Despite the United States Supreme Court's enunciation of a more liberal admissibility test in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Maryland courts consistently have utilized the *Frye/Reed* rule of general acceptance within the field.[11] *See Schultz v. State,* 106 Md.App. 145, 664 A.2d 60

---

**11.** The admissibility of expert testimony generally is addressed in the Maryland Rules, although Rule 5–702 is not intended to overrule or modify *Reed.* The Rule states:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill,

**498**

(1995). The Court of Appeals commented after *Daubert* that use of the *Frye/Reed* rule is "well settled in Maryland." *United States Gypsum Co. v. Mayor and City Council,* 336 Md. 145, 182, 647 A.2d 405 (1994).

**A**

Appellant argues that, under the *Frye/Reed* test, appellee failed to meet his burden of proving the general acceptance of the scientific technique used by Dr. Hammar. Appellee counters by asserting that Dr. Hammar's medical opinion testimony was not subject to the *Frye/Reed* test because it did not involve a new scientific technique, but rather, a medical opinion. Appellee further contends that appellant waived its right to contest the admissibility of the expert testimony, alleging that appellant failed to make a timely objection to Dr. Hammar's testimony. We agree with appellee's first assertion and decline to consider whether appellant properly preserved the issue for review.

In *Myers v. Celotex Corp.,* 88 Md.App. 442, 594 A.2d 1248 (1991), this Court addressed a dispute over whether it was proper for the trial court to exclude certain opinion testimony of a medical expert because the testimony was not proven as generally accepted by the medical community. The expert testified at trial without objection that, based on an electrical charge theory, he believed that asbestos, rather than cigarette smoking, caused plaintiff's cancer. *See id.* at 455, 594 A.2d 1248. After the expert stated on cross-examination that the electrical charge theory was his opinion, not the consensus of the medical community, defense counsel moved to have the testimony stricken. *See id.* at 456, 594 A.2d 1248. In granting defense counsel's motion, the trial judge stated, "[H]e has to be able to say within a reasonable medical certainty.

experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.
Md. Rule 5–702 (1998).

That's the definition of reasonable medical certainty. It's what is accepted within the medical community." *Id.* at 457, 594 A.2d 1248.

Upon review, we established that "[t]he standard for the admissibility of medical expert opinion testimony is reasonable medical probability." *Id.* at 458, 594 A.2d 1248 (citing *Andrews v. Andrews*, 242 Md. 143, 152, 218 A.2d 194 (1966)). Our conclusion was that the expert should have been allowed to testify as to how asbestos fibers cause cancer despite not being able to state that his electrical charge theory was generally accepted by the medical community. *See id.* at 455, 594 A.2d 1248. We reasoned that the *Frye/Reed* test "generally applies to the admissibility of evidence based upon novel scientific techniques or methodologies." *Id.* at 458, 594 A.2d 1248. The expert's testimony in *Myers*, however, concerned how asbestos caused cancer, which was not a novel or controversial assertion, and was based upon the expert's "personal observations and professional experience, and thus required only a reasonable degree of medical probability." *Id.* Furthermore, "[t]he holding in *Reed v. State* has not been extended to medical opinion evidence which is not 'presented as a scientific test the results of which were controlled by inexorable, physical laws.'" *Id.* at 458–59, 594 A.2d 1248 (quoting *State v. Allewalt*, 308 Md. 89, 98, 517 A.2d 741 (1986)). Consequently, the jury merely had to assess the expert's credibility in weighing his opinion, and his testimony was admissible even if a majority of his professional colleagues disagreed with it. *See id.* at 459–60, 594 A.2d 1248.

In the case *sub judice*, appellant argues that "the trial court erred in admitting and crediting the testimony of Dr. Hammar, because plaintiff did not offer any evidence tending to demonstrate the general acceptance and reliability of Dr. Hammar's new testimony under the *Frye/Reed* test." The basis for appellant's argument is that Dr. Hammar allegedly admitted he testified in another trial that he could not determine the date on which mesothelioma was contracted with any

reasonable medical certainty.[12] Appellant relies on *N.B.S., Inc. v. Harvey*, 121 Md.App. 334, 709 A.2d 162 (1998), calling it "remarkably similar" to the instant case.

In *Harvey*, defendants in a lead-paint exposure case relied on *Myers* for the assertion that their expert should not have been excluded from testifying. The trial judge, however, excluded the testimony because he was not satisfied with the doctor's qualifications as an expert after she had been retired for ten years. *See id.* at 339, 709 A.2d 162. We commented that the judge excluded the testimony because there was no factual basis supporting it and, "although [plaintiffs] endeavored to exclude [the doctor's] testimony on the basis of the *Frye/Reed* standard, the trial court's exclusion of that testimony was based upon Maryland Rule 5–702." *Id.* Consequently, appellant's reliance on *Harvey* in the instant case is misplaced. *Harvey* does not stand for the proposition that Dr. Hammar needed to offer evidence that the medical community generally accepted his methodology. *Harvey* involved a doctor's insufficient qualifications as an expert, not the inability to proffer that a medical opinion has gained general acceptance in the medical community. Therefore, as we evaluate Dr. Hammar's testimony, we do so under the standard enunciated in *Myers* that the opinion testimony be given to a reasonable degree of medical certainty.

Initially, we note that Dr. Hammar was offered, without objection, as an expert in the field of pulmonary pathology

---

12. Appellant filed a Renewed Motion to Take Judicial Notice of Testimony of two of appellee's experts given in other recent asbestos cases. This motion had been denied without prejudice by the Chief Judge of this Court in an order dated September 4, 1998. We shall deny the renewed motion because appellant offers the testimony to demonstrate the difficulty in applying the *Grimshaw* standard and this proffer is simply an attempt to impeach appellee's experts. We, however, grant the motion to the limited extent that we have alluded in Section B under "Public Policy," *supra*, to the asserted inconsistent expert testimony in demonstrating that prior appellate decisions recognize the imprecision of testimony in this area and have concluded, notwithstanding such imprecision, that expert testimony is the appropriate basis for deciding the onset of the latent asbestos-related disease.

and particularly with pathology of asbestos-related diseases. After testifying, Dr. Hammar was recalled by *de bene* deposition.[13] The following exchange occurred:

Q In the case of mesothelioma with a latency period of about 20 years or more, do you have an opinion as to how long before that mesothelioma is diagnosed, the mesothelioma cancer first starts to grow?

A I do have an opinion, yes.

Q And what is that opinion?

A That that tumor had been growing for at least 10 years before it was diagnosed clinically.

Q And what is the basis for that opinion?

A It is based on many things. It is based on my assumption that the tumorigenic process with respect to the development of mesothelioma is multifactoral, not a multifactoral process, but a multistaged process that occurs over a period of time, and that there are injuries to cells, repairs of cells and injuries that eventually change a normal cell to a malignant cell.

It is based on my knowledge of growth rates of other tumors in which good information is available, such as lung cancer.

It is based on my knowledge that the majority of mesotheliomas have a relatively low S phase and usually are deployed with respect to their DNA index, and it is based on some cases that I have seen of people who have histories of pleural effusions, over sometimes as great as 15 years, in which they eventually—in which they have eventually been diagnosed with mesothelioma.

Dr. Hammar gave his opinion based upon information regarding mesothelioma and his experience in seeing over 2,500 cases of mesothelioma. His opinion of the growth rate of mesothelioma was not based on any novel techniques or new

---

**13.** Counsel for another plaintiff, Joseph Gotti, read the questions posed to Dr. Hammar during the April 4, 1997 deposition while appellee's counsel read Dr. Hammar's responses.

scientific tests. Rather, it was given based on his expert medical experience. This testimony was subject to the standard from *Myers,* not *Frye/Reed,* and the court properly allowed the jury to weigh the credibility of Dr. Hammar's testimony.

Appellant argues that Dr. Hammar could not testify to a reasonable degree of medical certainty as to how long before diagnosis a person's mesothelioma develops. The following occurred during the recall by *de bene* deposition:

Q Dr. Hammar, if I asked you to assume a case of mesothelioma where the occupational exposure to asbestos took place in approximately 1975, and the mesothelioma was diagnosed in approximately May of 1995 with symptoms of that mesothelioma seemingly having presented in the fall of 1994, do you have an opinion to a reasonable degree of medical certainty as to how far back in time that person's mesothelioma cancer first arose?

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled.

A I think that the tumor would have started to grow at least 10 years before it was diagnosed in 1994, so that would be in 1984.

Appellant's contention is that Dr. Hammar's statement that "I don't think anybody can tell you exactly when his tumor started," demonstrates that his testimony was mere "speculation and guesswork." Appellant misconstrues Dr. Hammar's inability to determine "exactly" when the tumor started as speculation. Based on the passage referenced earlier in which Dr. Hammar summarized the basis for his opinion, we disagree with appellant. The court properly allowed Dr. Hammar to provide his own opinion to a reasonable degree of medical certainty based on his expertise as a pulmonary pathologist.

**B**

 Appellant additionally contends that the trial court should have accepted Dr. Gabrielson's testimony instead of Dr. Hammar's. A trial court's decision whether to admit expert testimony is within its discretion and will only be disturbed on appeal only upon an abuse of that discretion. *See Quinn v. Quinn*, 83 Md.App. 460, 470, 575 A.2d 764 (1990). When a court is confronted with two experts, "the trier of fact must evaluate the testimony of both of them and decide which opinion, if any, to accept." *Id.*

Appellant relies on Dr. Gabrielson's statement that, when an individual manifests discernible symptoms of mesothelioma, the person "probably had a very small cancer five years ago, or maybe even six or seven years ago." Because appellee was diagnosed with mesothelioma in 1995, appellant asserts that Dr. Gabrielson's testimony supports a finding that the onset of mesothelioma could not have occurred before 1987, after the effective date of the cap statute. Despite this assertion, appellant provides no evidence, and our review of the experts' testimony reveals none, demonstrating that it was clearly erroneous for the trial court to credit Dr. Hammar's testimony over Dr. Gabrielson's. Dr. Gabrielson's comment came in response to a hypothetical question not concerning appellee, and he was not asked to give a response with a reasonable degree of medical certainty. Dr. Gabrielson's testimony, as appellee contends, addressed what role asbestos exposure plays in the development of mesothelioma rather than how long before diagnosis the mesothelioma first develops.

In the trial court's memorandum opinion, the court noted the conflicting expert testimony concerning the date of the onset of mesothelioma and the difficulty in the medical community in pinpointing the onset date for an asbestos-related disease. The judge appeared to give more credibility to Dr. Hammar's testimony because of the potential of an inaccurate diagnosis. The court reasoned:

Logic dictates that some tumors can be present not only long before diagnosis but long before the onset of symptoms

as well. The experts in the instant case based their hypotheses of when the tumor was born on the date of diagnosis. Thus, an untimely diagnosis may cause an inaccurate assessment of when the disease developed. For instance, a doctor may mis[-]diagnose a symptomatic patient and thus delay the diagnosis of mesothelioma. Or, a patient may be asymptomatic for years with a mesothelioma tumor growing inside him.

There is no evidence or argument that convinces us that the court was clearly erroneous in seemingly accepting Dr. Hammar's testimony over Dr. Gabrielson's.

### III. CONSTITUTIONAL RIGHT TO A JURY TRIAL

Appellant next argues that the trial court violated its constitutional right to a jury trial by refusing to permit the jury to decide when the cause of action arose.

The Maryland Constitution, it asserts, requires the jury to determine the date on which appellee's cause of action arose because this determination is a factual question. Article 23 of the Maryland Declaration of Rights commands that "[t]he right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State ... shall be inviolably preserved." Because an alleged question of fact exists as to when the triggering event occurred, appellant contends that the jury should have determined the date of onset for appellee's disease.

Specifically, appellant contends that the enforceability of the cap statute under the *Grimshaw* standard is a factual issue that should have been decided by the jury because the Maryland Constitution preserves the right to a jury trial for all issues of fact. Section 11–108 of the statute limiting noneconomic damages provides:

> (d) *Jury trials.*—(1) In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.[14]

---

**14.** This subsection was not contained in the original statutory cap enacted in 1986. In *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325,

(2)(i) If the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b) of this section, the court shall reduce the amount to conform to the limitation.

C.J. § 11–108(d). Appellant asserts that this section should not be interpreted as removing the determination of the statute's applicability from the jury. The section, appellant alleges, does not prohibit the jury from determining when a cause of action arises; rather, it prevents the court from informing the jury of the effect of the statutory cap. The court disagreed and held in its memorandum opinion filed after the jury returned its verdict: "The issue of whether the cap applies in the instant case as stated *supra* is for the court to decide based on the evidence. Simply stated, it is 'up to the trial court, as the trier of fact on that issue, to weigh the evidence and reach a final determination.' *Grimshaw,* 115 Md.App. at 165, 692 A.2d 5." Based on this pronouncement by the trial court construing our decision, appellee asserts application of the cap statute has been decided.

With respect to the trial court's conclusion that it could weigh the evidence and reach a final determination, appellant correctly points out in its brief that, "[i]n *Grimshaw,* however, there is no indication that any party asked that this issue be submitted to the jury, and no party argued on appeal that the jury should have resolved this issue." Hypothesizing that "[t]he parties implicitly agreed to have the enforceability of the statutory cap decided by the court in that case," appellant acknowledges that "[i]t may well have been correct for the *Grimshaw* panel to characterize the trial court as the finder of fact in *that* case." The court, in *Grimshaw,* denied motions to apply the statutory cap filed after the jury returned its verdict without stating any reasons or issuing a written opinion. The

---

1328 (D.Md.1989), the United States District Court for the District of Maryland held that the statute's language was such that the jury should be instructed not to award noneconomic damages in excess of $350,-000. In response to the decision in *Franklin,* the General Assembly added subsection (d)(1) to assure that the jury would not be informed of either the existence or amount of the statutory cap.

only issue before us was whether "[t]he trial court erred when it failed to apply the statutory cap." *Grimshaw*, 115 Md.App. at 149, 692 A.2d 5.

Against this procedural backdrop, we said:

Unfortunately, we are without the benefit of the trial court's reasoning in denying appellants' motion to apply the statutory cap to noneconomic damages. We, therefore, must assume that the trial court denied appellants' motion to apply the statutory cap based on the expert testimony that mesothelioma occurred prior to July 1, 1986. Such a finding was not clearly erroneous because there is evidence in the record to support it.

*Grimshaw*, 115 Md.App. at 165, 692 A.2d 5.

It was this language, in *Grimshaw*, to which the trial court alluded when it said "[i]t is up to the trial court, as the trier of fact on that issue, to weigh the evidence and reach a final determination." There, as appellant points out, the trial judge was the trier of fact on the issue because the parties implicitly agreed to allow the court to decide. Our rationale in *Grimshaw* was that, "[a]lthough there was evidence in the record contrary to that of [plaintiff's experts], it was up to the trial court, as the trier of fact on that issue, to weigh the evidence and reach a final determination." *Id.* Furthermore, we concluded by "affirm[ing] the trial court's holding that the statutory cap for noneconomic damages for personal injury does not apply to the instant case." *Id.* In *Ford Motor Co.*, this Court followed *Grimshaw* and held, "[u]nder *Grimshaw*, we will uphold a trial court's determination of when an injury arises as long as that determination is supported by legally sufficient evidence." *Ford*, 119 Md.App. at 48, 703 A.2d 1315. We hold that, when a party timely requests that the determination of the applicability of C.J. § 11–108 be submitted to the jury pursuant to legally correct special verdict issues and jury instructions, Article 23 of the Maryland Declaration of Rights requires that the factual determination of when a latent asbestos-related *disease* comes into existence be submitted to the jury.

Appellant asserts that *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985), controls this issue. In *Hill,* a federal district court certified questions of law to the Court of Appeals concerning the applicability of a limitations statute that applied only to injuries occurring after July 1, 1975. The Court answered that "[w]hether the original allegedly negligent misdiagnosis of Hill's condition caused some harm and therefore 'injury' prior to July 1, 1975 is a question of fact. . . ." *Id.* at 697, 501 A.2d 27. The Court's determination that when an injury occurred for limitations purposes is a question of fact for the jury is analogous to the adjudication of appellee's claim in the instant case. *Hill's* rationale may be applied to appellee's claim because the date upon which the harm arose is a matter of contention between the parties involving a factual dispute. As we discussed, *supra,* however, analysis of the accrual of a cause of action for limitations purposes is distinguishable from when an action arises for purposes of the statute on damages. *Hill,* therefore, is not controlling in the case *sub judice* because it addressed the applicability of a statute of limitations, rather than a statutory cap on noneconomic damages.

The Court of Appeals addressed this issue in *Murphy v. Edmonds, supra,* in which C.J. § 11–108 was challenged on the basis that it violated the right to a jury trial guaranteed by Articles 5 and 23 of the Maryland Constitution. In *Murphy,* the plaintiffs contended that the trial court's decision to reduce the noneconomic damages award in compliance with C.J. § 11–108 "interferes with the jury's exclusive province in determining factual issues," *id.* at 370–71, 601 A.2d 102, because C.J. § 11–108 prohibits the jury from being informed about the statutory cap. The Court of Appeals began by commenting that, while the right to a jury trial extends to issues of fact, it "does not extend to issues of law, equitable issues, or matters which historically were resolved by the judge rather than by the jury." *Id.* at 371, 601 A.2d 102 (citations omitted). When the legislature authorizes a jury trial to decide the facts with regard to liability, there is no interference with the right to a jury trial if the statute fixes

the damages. *See id.* at 372, 601 A.2d 102 (citing *Branch v. Indemnity Ins. Co.,* 156 Md. 482, 486, 144 A. 696 (1929)).[15]

Applying these principles to C.J. § 11–108, the Court of Appeals reasoned:

If the General Assembly had provided in § 11–108 . . . that the trial judge, rather than the jury, should determine the amount of noneconomic damages or the amount of noneconomic damages in excess of $350,000, a substantial issue concerning the validity of the statute would be presented. The General Assembly, however, did not attempt to transfer what is traditionally a jury function to the trial judge. Instead, the General Assembly abrogated any cause of action for noneconomic tort damages in excess of $350,000; it removed the issue from the judicial arena. No question exists concerning the role of the judge versus the jury with respect to noneconomic tort damages in excess of $350,000. Therefore, no question concerning the constitutional right to a jury trial is presented.

*Id.* at 373, 601 A.2d 102.[16] As a result, the Court held that neither the $350,000 limit nor the prohibition on informing the jury of the limit interferes with the jury's ability to resolve the pertinent factual issues. *See id.* The language from *Murphy* strongly weighs in favor of having the jury decide when the cause of action arose because the legislature, in creating C.J. § 11–108, "did not attempt to transfer what is traditionally a jury function to the trial judge." The Court of Appeals concluded that the restriction on informing the jury of the statute was not a violation of the right to a jury trial because

---

**15.** *See also Franklin v. Mazda Motor Corp.,* 704 F.Supp. at 1331 ("The right of jury trials in cases at law is not impacted. Juries always find facts on a matrix of laws given to them by the legislature and by precedent, and it can hardly be argued that limitations imposed by law are a usurpation of the jury function.").

**16.** Because of the holding of the Court of Appeals in *Murphy,* we decline to address appellee's argument that the statute should not be applied because it violates the Maryland Declaration of Rights and Maryland Constitution.

the statute was not intended to affect the jury's function. *See id.* at 373, 601 A.2d 102.

Although we are aware that states have differed in their view of whether this issue is one of law or fact, the Court of Appeals in *Murphy* peripherally addressed this issue through its reliance on *Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 376 S.E.2d 525 (Va.1989).[17] In *Etheridge,* the Supreme Court of Virginia was presented with a constitutional attack on its statutory cap based on the right to a jury trial. The court opined that the jury's fact-finding function includes an assessment of damages, and that function is not completed until the jury examines the facts and assigns a value to the damages. *See id.* at 529. "Thereafter, it is the duty of the court to apply the law to the facts." *Id.* The court concluded that "the Virginia Constitution guarantees only that a jury will resolve disputed facts," and that "[w]ithout question, the jury's fact-finding function extends to the assessment of damages." *Id., quoted in Murphy,* 325 Md. at 374, 601 A.2d 102.

This reasoning ineluctably leads to the conclusion that the jury does not complete its function as trier of fact until it assesses the damages. Therefore, when parties dispute the date upon which the cause of action arose, the jury must determine this issue in order to complete its function as trier of fact.[18] Only after this determination may the court proper-

---

**17.** We note that other state courts have concluded that the determination of noneconomic damages is within the province of the jury. *See Moore v. Mobile Infirmary Ass'n,* 592 So.2d 156, 163 (Ala.1991) (noneconomic damages is most peculiarly within the jury's discretion); *Sofie v. Fibreboard Corp.,* 112 Wash.2d 636, 771 P.2d 711, 717 (Wash.) (stating that the jury's role in determining noneconomic damages may be more essential than determining economic damages), opinion amended by 112 Wash.2d 636, 780 P.2d 260 (1989).

**18.** The decision that the jury should determine the factual issue of when the cause of action arose finds further support in the case *sub judice.* Unlike in *Murphy,* wherein the date the cause of action arose was irrelevant and uncontested, in the case *sub judice* the date appellee's cause of action arose for purposes of the statutory cap is a disputed fact.

ly apply the law to the facts and conclude whether the statutory cap on noneconomic damages should apply.

Appellant argues that, because C.J. § 11–108 is open to different interpretations, the preferred course as a matter of statutory construction would be to avoid the interpretation involving a constitutional infirmity. Accordingly, appellant asserts, "the trial court cannot inform a jury of the import of its factual finding regarding the date on which a plaintiff's claim arose; the statute does not purport to remove the underlying factual issue from the jury." We are satisfied that *Murphy* and rationale therein comport well with the interpretation that the jury must determine factual issues underlying the statutory cap even though the jury will not be informed of its existence.

■ Procedurally, the trial judge is obliged to allow the jury to make the factual determination without invading the proscription of C.J. § 11–108 against informing the jury of the existence of the statutory cap on noneconomic damages. Prior to the jury instructions, the parties should submit, along with proposed instructions on liability and damages, a proposed instruction requiring the jury to decide when the plaintiff developed mesothelioma. Such an instruction, unlike the supplemental instruction presented by appellant, must include the proper standard in Maryland for determining when the cause of action arose. Accordingly, whether the particular plaintiff suffers from an asbestos-related injury or disease should dictate how the instruction is worded.

The judge must then instruct the jury to weigh the evidence and render a finding of when the cause of action arose. As explained above in Section I, if the plaintiff suffers from an asbestos-related injury, the jury should be instructed to find that the cause of action arose when functional impairment first occurred. On the other hand, if the plaintiff contracts an asbestos-related disease, the jury must be instructed to find that the cause of action arose when the disease first came into existence. At no time, of course, should the trial court inform the jury of the existence of the statutory cap.

As explained above, the jury's function does not end until it ascertains the facts and assesses the damages. Ascertaining the appropriate facts for a recovery of damages in the instant case required the jury to make a factual finding regarding when the cause of action arose.[19] The implication of that factual finding becomes a legal issue, i.e., the applicability of the statutory cap only after the jury determines when the cause of action arose. At that time, the trial court adopts the jury's factual determination and applies the statute only if the jury decided that the cause of action arose after July 1, 1986. Because the jury's duty to examine the facts and assess the damages was never relegated to the trial judge pursuant to C.J. § 11–108, this procedure does not impinge on the right to a jury trial guaranteed in Article 23.

Appellee, nevertheless, argues that appellant waived the right to a jury trial on the issue of the statutory cap's application by failing to make the request after the jury returned its verdict. Although appellee asserts that evidence regarding the applicability of the statutory cap was not relevant until after the jury returned a verdict in excess of the cap, we must address whether appellant preserved the issue for consideration on appeal.[20]

Before discussing the jury instructions, the court reviewed the proposed verdict sheets propounded by appellee's counsel.[21] It is important to note that appellant's proposed verdict sheet was submitted on the same day as these discussions, April 15, 1997, and included the following question: "On what date do you find that [appellee] was functionally impaired as a

---

**19.** Unfortunately for appellant, as discussed above, the court did not err by refusing to submit the issue to the jury because appellant's proposed instruction was an incorrect statement of law.

**20.** Although appellee did not proffer the argument, we shall review the record to determine if appellant properly preserved the issue of whether the jury should participate in deciding the cap's applicability.

**21.** Appellee's proposed verdict sheet did not contain a question asking the jury to make a determination according to the standard set forth in *Armstrong II* or *Grimshaw*.

result of having developed mesothelioma?" This colloquy transpired during the jury instruction discussion:

> THE COURT: ... The second version [of appellee's proposed verdict sheet], which is a special verdict sheet, is the version this [c]ourt has used in every mesothelioma [sic] case since 1992.
>
> And so far as this [c]ourt is aware, no Court of Appeals of this state has ever reversed this [c]ourt on the use of this verdict·sheet and the form, as well as the content.
>
> And I simply want to ask defense and third-party defendants if they would like to comment on it, so that the record shows any objections they might have to the use of that form, because the [c]ourt does intend to adopt that form, subject to any modifications that the [c]ourt might be persuaded to be made by counsel.
>
> . . .
>
> [APPELLANT'S COUNSEL]: This is· the first time I've had a chance to see this, but in particular, we have asked for—in our proposed verdict sheet that an instruction, or that a special verdict would be, I guess, question 1–A on this—
>
> THE COURT: You want 1–A to be, when did he develop the disease, I believe.
>
> [APPELLANT'S COUNSEL]: When was he functionally impaired as a result of—
>
> THE COURT: That's not a question that this [c]ourt will submit to the trier of fact, and you have an exception.

No further discussion transpired at this point in the proceedings with respect to appropriate language for the special verdict sheet.

After additional discussion, appellant argued:

> [APPELLANT'S COUNSEL]: ... On the functional impairment question that we requested, I would object to not getting it, because *I think it's a fact question, and we are denied a right to a trial by jury.*

I don't think it's any different than for, say, a statute of limitations question that's submitted to the jury.

It's a question of when [appellee] was functionally impaired, *which is a fact question and should be submitted to the jury.*

[APPELLANT'S CO–COUNSEL]: And I would supplement that and say that *it would be a violation of our 7th Amendment right under the Constitution of the United States*[22] *to a trial by a jury* and to the appropriate Maryland Constitution provisions that allow a trial by a jury.

THE COURT: 7th Amendment?

[APPELLANT'S CO–COUNSEL]: Over 20 bucks, Judge.

THE COURT: You have the right amount anyhow. Okay.

[APPELLANT'S CO–COUNSEL]: It has to do with a right to a fair trial.

THE COURT: I would like to further, or next review the requested jury instructions of the plaintiff.

[APPELLANT'S CO–COUNSEL]: Judge, I hate to do this, and I will be quiet soon. I want to make sure the record reflects that we—

THE COURT: I'm disappointed. I have enjoyed listening to you.

[APPELLANT'S CO–COUNSEL]: Before we leave the special verdict form, I would object to the giving of question four in that there is no evidence of strict liability on our part. . . .

Counsel coupled the issues of the propriety of the *Grimshaw* standard and the right to have the jury decide factual issues when he stated, ". . . it would be a violation of our 7th Amendment right under the Constitution of the United States to a trial by jury and to the appropriate Maryland Constitutional provisions that allow a trial by jury," which related to

---

**22.** The Seventh Amendment to the United States Constitution has never been made applicable to the states. *Minneapolis and St. Louis Railroad Company v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916).

his earlier statement that "... on the functional impairment question that we requested, I would object to not getting it, because I think it is a fact question, and we are denied a right to a trial by jury." When the trial judge asked, regarding the special verdict sheet, "you want 1–A to be, when did he develop the disease, I believe," counsel corrected the trial judge: "When was he functionally impaired as a result of -" The court then said, "That's not a question that this [c]ourt will submit to the trier of fact, you have an exception." The court did not make any further ruling after refusing to submit the question of when appellee was functionally impaired to the jury for a special verdict.

Subsequent to the colloquy concerning the jury verdict sheet, the following exchange occurred during a discussion of jury instructions:

> [APPELLANT'S COUNSEL]: Supplemental instruction number one, that's when—when [appellee] was functionally impaired as a result—
>
> THE COURT: Okay. You have number one, that's the only one that you had given in addition. All right.

The proposed issues contained in the special verdict sheet and the supplemental jury instruction constituted incorrect statements of law, particularly in view of appellant's citing of *Grimshaw* as authority for the instruction. That supplemental instruction stated:

> An issue you must decide is when [appellee] developed mesothelioma. Under Maryland law, mesothelioma is said to develop *when a plaintiff first suffers functional impairment. Mere exposure to asbestos and cellular changes resulting from asbestos exposure alone is not functional impairment or harm.*

As discussed in Section I, this jury instruction would have been a proper statement of the law if appellee had suffered an asbestos-related *condition* or *injury*, rather than *disease*. The evidence presented at trial, however, demonstrated that appellee contracted the asbestos-related disease mesothelioma. Although the proposed instruction was neither an accurate

statement of the law nor a reflection of the injury suffered by appellee, the trial judge was put on notice that appellant sought to have the jury decide the issue in any event.

After the discussion of proposed jury instructions, the following exchange occurred:

[APPELLANT'S COUNSEL]: I would make a motion for directed verdict against [appellee] or in favor of [appellant] in the direct action of [appellee] against us in that there has been, as previously stated, no legal duty shown to [appellee] that [appellant] owed, the claim is barred as a matter of law by the government contractor defense. . . .

Again, we would move on the cap issue, Your Honor, at this time for a directed verdict in [appellee's] case, his noneconomic loss be capped. And I think the amount is $350,000. *And the basis for that is the complete failure of [appellee] to show that any injury was manifested prior to the effective date of the 1986 statute.* And, in fact, the evidence is to the contrary. Dr. Hammar testified, as the [c]ourt heard, that the first impairment manifestation in [appellee], I asked him specifically about [appellee], was probably two to three months prior to diagnosis. That he could not under *Daubert* or any standard tell-

THE COURT: *Frye–Reed?*

[APPELLANT'S COUNSEL]: *Frye–Reed* in particular. . . . There is no evidence—as the [c]ourt is well aware, cellular change is not enough. What was present in Grimshaw is not present in this case, and that was Dr. Gabrielson's testimony at five to ten years.

Your Honor is familiar with the argument [appellant's counsel] made earlier, the only evidence is five years, maybe six, and [appellee], I believe, was diagnosed in 1995. That's all.

THE COURT: Motion denied.

[APPELLANT'S COUNSEL]: *Has the [c]ourt made a determination that the cap is going to apply?*

THE COURT: *I haven't made a determination on the cap at all. I denied your motion.*

[APPELLANT'S COUNSEL]: I request the [c]ourt—I guess I will have to wait until there is a verdict. I don't know how I will do that.

THE COURT: Post judgment motion. Post judgment motion the [c]ourt will consider at that point.

[APPELLANT'S COUNSEL]: Of course, the [c]ourt is well aware of our previous jury request that the jury determine this issue.

THE COURT: Yes.

[APPELLANT'S COUNSEL]: That presents a dilemma, Your Honor. I don't know it's your responsibility to cure for me. It is my position that I should get a directed verdict on that question, but if not, then it is a question of fact for the jury.

And if the [c]ourt has not ruled, then it would be my position that it should be submitted to the jury.

THE COURT: Motion denied.

The argument of appellant's counsel included a request in its motion for a directed verdict that the trial court essentially grant partial summary judgment capping the noneconomic damages according to the statute. As support for this argument, appellant's counsel asserted that there was a "complete failure of [appellee] to show that the injury was manifested, or any impairment was manifested prior to the effective date of the 1986 statute." After appellant's counsel asked whether the court had made a determination that the cap should apply, the court responded, "I haven't made a determination on the cap at all. I denied your motion." Thus, the court denied appellant's motion for a directed verdict applying the statutory cap. The court, however, instructed appellant's counsel to address the issue in a post-judgment motion. Pursuant to the court's instructions, appellant filed a motion for judgment

notwithstanding the verdict or a new trial, and a motion to enforce the statutory cap. Both of these motions contained arguments that the jury should determine the applicability of the statute.[23]

---

**23.** In its Statement of Grounds and Authorities In Support of Owens Corning's Motion for Judgment Notwithstanding the Verdict Or, In the Alternative, A New Trial, Section E references portions of the transcript reprinted herein, stating that it "is entitled to a new trial, because any factual dispute regarding the applicability of the cap should have been submitted to the jury." The transcript of the proceedings, however, discloses that appellant repeatedly made requests for special verdict forms and jury instructions that were incorrect statements of the law. With respect to the submission of the factual issue to the jury, appellant's post-trial motion recites:

> Plaintiff does not challenge Owens Corning's contention that the jury, and not the court, is the proper decisionmaker [sic] to resolve any factual issues involved in determining when plaintiff's cause of action arose for purposes of applying the statutory damages cap. As a result, assuming *arguendo* that there was any factual basis for a finding in plaintiff's favor on the cap issue, this issue should have been submitted to the jury for its decision.

> Plaintiff's only response to this point is to assert that Owens Corning waived the issue by failing to submit a proper jury instruction. Plaintiff's response is without merit, for two reasons.

> First, Owens Corning's instruction *did* properly state the law. Plaintiff claims that "functional impairment" is not the proper test for determining when a cause of action arises, but his claim is belied by the express language of the very case on which he purports to rely. In *Anchor Packing Co. v. Grimshaw*, the Court of Special Appeals unambiguously held that "a cause of action in an asbestos-related injury claim does not arise until the asbestos fibers inhaled into the lungs cause *functional impairment.*"

(Citations omitted.)

As previously noted, we held in *Grimshaw* that functional impairment, *vis-a-vis*, manifestation of symptoms, was not the proper standard for deciding when a latent asbestos-related *disease* begins for purposes of applying the cap:

> We hold, therefore, that an injury occurs in an asbestos-related injury case when the inhalation of asbestos fibers causes a legally compensable harm. Harm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer. We, therefore, reject appellants' assertion that the injury or harm does not arise *until the symptoms of the disease become apparent.* Appellants argue that such an approach would be less speculative. We disagree.

*Grimshaw*, 115 Md.App. at 160, 692 A.2d 5 (emphasis added).

Thus, appellant continued to insist, in its post-trial motions, on submission to the jury of a standard which the trial court had indicated would not be submitted because it was legally incorrect.

Maryland Rule 2–522, which addresses decisions of trial courts regarding submission of issues to the jury, states the following:

> *(c) Special verdict.* The court may require a jury to return a special verdict in the form of written findings upon specific issues.... If the court fails to submit any issue raised by the pleadings or by the evidence, all parties waive their right to a trial by jury of the issues omitted unless before the jury retires a party demands its submission to the jury. As to an issue omitted without such demand, the court may make a finding or, if it fails to do so, the finding shall be deemed to have been made in accordance with the judgment entered.
>
> No party may assign as error the submission of issues to the jury, the instructions of the court, or the refusal of the court to submit a requested issue unless the party objects on the record before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

Md. Rule 2–522(c) (1998). Therefore, for the purposes of Rule 2–522, the important question is whether appellant raised the issue prior to the jury's deliberation. We believe it did.

As discussed above, appellant's counsel requested a special jury verdict on the issue of when appellee was functionally impaired. The trial court, however, declined to submit the question appellant requested.

After the discussion regarding jury instructions in which appellant's counsel sought an instruction and special jury verdict enabling the jury to determine the date on which appellee's functional impairment began, counsel for appellant sought to have the court decide the applicability of the cap statute, urging the court to dispose of the issue favorably to appellant on counsel's motion for directed verdict. Apparently believing that the court would not rule that the statutory cap was applicable, appellant's counsel reverted to his prior position, seeking to assert appellant's entitlement to a jury determination of the statutory cap issue.

Counsel referred to a "previous jury request that the jury determines this issue" and argued that, "[i]t is my position that I should get a directed verdict on that question, but if not, then it is a question of fact for the jury. And if the [c]ourt has not ruled, then it would be my position that it should be submitted to the jury." Appellant's counsel again, therefore, raised the jury issue after it became clear that the trial court was not going to grant partial summary judgment and apply the statutory cap, asserting that it should be a question for the jury to decide.

Our review of the record reveals that, prior to submission of the case to the jury, the trial judge never ruled that the question of the statutory cap's applicability was one for the court, because the discussion focused on whether appellant was proposing that an improper standard be submitted.

Citing *Grimshaw*, however, the court, in its memorandum opinion, expressed its belief that it is "up to the court" to "reach a final determination." The court issued its opinion after the jury returned its verdict. Significantly, prior to submission of the case to the jury, counsel, apparently recognizing that the issue would be moot if the jury returned a verdict of less than $350,000 for noneconomic damages, had stated, "I guess I will have to wait until there is a verdict. I don't know how I will do that." The court responded that it would consider the issue on a postjudgment motion. Counsel, at that point, reminded the court of its request that the jury determine the issue.

At different times during the discussions regarding the special verdict form and jury instructions, counsel advised the court of his position that determination of the applicability of the cap was a jury issue. Counsel had stated, "I think it's a fact question, and we are denied a right to trial by jury" and "[i]t would be a violation of our 7th Amendment right under the Constitution of the United States to a trial by jury and to the appropriate Maryland Constitutional provisions that allow a trial by jury." We cannot say, on the state of this record, that appellant's counsel has waived its objection by acquiesc-

ing in the court's ruling that the discussions of the verdict sheet and jury instructions was not the proper time to address a determination of the applicability of the statutory cap.

 Finally, we turn to the question of whether the trial court had any obligation to correct appellant's proposed instruction and to submit a proper statement of law to the jury. Our review of Maryland case law has not uncovered any decisions in which counsel properly insisted on his entitlement to have the jury decide an issue that itself was improper. The question is usually whether the issue is one of fact for the jury or whether the instruction is a proper statement of the law, rather than both issues intertwined. As early as 1909, the Court of Appeals held that "[c]ourts of justice are not bound to modify or fashion the instructions moved for by counsel, so as to bring them within the rules of law. They may, if they see fit, content themselves with a simple refusal of any prayer not sanctioned by the rules of law." *F.W. Dodge Co. v. H.A. Hughes Co.*, 110 Md. 374, 382, 72 A. 1036 (1909) (citations omitted). Moreover, when an instruction is indefinite or ignores a theory of the case, "the trial [c]ourt is not bound to modify instructions submitted by counsel so as to make them correct statements of the law, [and] the [c]ourt should refuse an incorrect prayer, not sanctioned by the rules of law." *Annapolis Gas & Elec. Light Co. v. Fredericks*, 112 Md. 449, 457, 77 A. 53 (1910) (citations omitted).

In *Glover v. State*, 88 Md.App. 393, 398–400, 594 A.2d 1224 (1991), we addressed the distinction between a proposed instruction that is technically erroneous and one that is potentially misleading. In *Glover*, the appellant conceded that his proposed instruction was inaccurate but argued that the error was not a sufficient reason for the court to refuse to instruct the jury on a relevant legal issue. The State, meanwhile, countered that the instruction was inaccurate and potentially misleading enough [24] that the trial court's refusal to give it was

---

**24.** For cases discussing misleading and inaccurate jury instructions, see *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), *cert. denied*, 502 U.S.

proper. In *Glover*, we concluded that a defendant has no right to a potentially misleading instruction, and a court's refusal to grant it is not error. *See id.* at 398, 594 A.2d 1224. When a requested instruction is only technically erroneous,[25] however, a trial court's failure to include a correct instruction is error. *See id.*

In order to determine whether appellant's requested instruction was technically erroneous or potentially misleading, we look to the following principle from *Glover*:

> If the premise of the instruction requested by defendant is relevant and sanctioned by law, rather than one contrary to it, a circuit court has an obligation to instruct on the point even if the language of the instruction offered by the defendant is in some respects erroneous.

*Id.* at 400, 594 A.2d 1224. In the instant case, as explained above, the date upon which appellee manifested symptoms would have been a relevant standard for the jury to have considered if appellee had contracted pleural plaques rather than mesothelioma. Because appellee contracted mesothelioma, however, the onset of disease standard is proper, making the manifestation standard irrelevant to the issues at trial.[26]

We recognize that counsel should have presented his objection with greater clarity in view of the court's admonition that the proposed verdict form and jury instruction constituted incorrect statements of the law. It is a settled principle of law that a trial judge should not give any requested instruction which is improper under the facts of the case. *Singleton*

---

835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), and *Collins v. State*, 318 Md. 269, 568 A.2d 1, *cert. denied* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990).

**25.** For cases discussing technically erroneous instructions, see *Privette v. State*, 320 Md. 738, 580 A.2d 188 (1990), and *Clark v. State*, 80 Md.App. 405, 564 A.2d 90 (1989).

**26.** *See also Chambers v. State*, 337 Md. 44, 51, 650 A.2d 727 (1994) (holding that a "proposed instruction did not contain 'applicable law,' and that the trial court therefore had no obligation to give the instruction, either as submitted ... or in any revised form").

*v. Roman,* 195 Md. 241, 72 A.2d 705 (1950). Explicating Maryland Rule 4–325(c), however, we have penned that

> the Rule requires the court to "instruct the jury as to the applicable law" when requested to do so by a party; it does not specify that the court must instruct the jury as to the applicable law only upon request of a party by means of a proposed instruction *which correctly states the law.*

> Moreover, to interpret the Rule as requiring a party desiring an instruction to submit a suggested one which contains a correct statement of the law could lead to anomalous and absurd results. Consider the following scenario. The evidence in a case would support the giving of an instruction on a subject of some importance in the case and which both parties agree should be given. Unfortunately, neither of the proposed instructions submitted by the parties is a technically correct statement of the law on the subject. Under the State's argument, notwithstanding the importance of the issue, hence, the desirability of instructing the jury on it, and the fact that both parties requested an instruction on the point, the court would not have to give *any* instruction.

*Clark v. State,* 80 Md.App. 405, 414, 564 A.2d 90 (1989) (emphasis added in first paragraph).

The unique facts of this case compel us to conclude that the ends of justice can only be served by granting appellant the opportunity to submit the issue of the statutory cap to a jury, particularly in view of the court's advisement that it would consider the cap issue on appellant's post-trial motion. On remand, the circuit court should submit to a newly empaneled jury only the limited issue of when mesothelioma arose in appellee. Should the jury determine that the disease arose before July 1, 1986, the statutory cap would not be applicable and the noneconomic damage award of the original jury would stand. A jury decision that appellee's mesothelioma arose on or after July 1, 1986, on the other hand, would require the circuit court to apply the $350,000 cap on the noneconomic damage award.

## IV. EXCESSIVENESS OF THE JURY VERDICT

Appellant next contends that the jury's award of $15 million in noneconomic damages was excessive as a matter of law and that the trial court abused its discretion by failing to reduce the award.[27] A decision regarding the excessiveness of a jury's award is within the discretion of the trial court, and an abuse of that discretion is reviewed by this Court under "extraordinary circumstances." *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 449, 601 A.2d 633 (1992); *Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988); *Conklin v. Schillinger,* 255 Md. 50, 68, 257 A.2d 187 (1969). In Maryland, the trial judge "should extend the fullest consideration possible" to the jury's verdict before determining that it "shocked his conscience." *See Conklin,* 255 Md. at 69, 257 A.2d 187. The Court of Appeals elaborated:

> The standard to be applied by a trial judge in determining whether a new trial should be granted on the ground of excessiveness of the verdict has been variously stated as whether the verdict is "grossly excessive," or "shocks the conscience of the court," or is "inordinate" or "outrageously excessive," or even simply "excessive."

*Banegura,* 312 Md. at 624, 541 A.2d 969 (citing *Conklin,* 255 Md. at 69, 257 A.2d 187). We shall examine whether the trial court abused its discretion by deciding that the jury's $15 million award was not excessive.

Appellant argues that the award was excessive because it exceeded the statutory cap on noneconomic damages by nearly forty-three-fold and exceeded the amount of noneconomic damages claimed by appellee by fifty percent. Although a comparison of the statutory cap to appellee's award in the instant case is a consideration, it was decided that the statutory cap did not apply to appellee's recovery of damages. Additionally, appellant alleges that the verdict in this case was

---

27. The trial court reduced the award to $10 million because the $15 million exceeded the $10 million amount that was claimed in appellee's complaint, *see infra,* not because the award was excessive.

nearly nine times the $1.7 million average verdict for noneconomic damages in concurrent Maryland mesothelioma cases.

First, we shall examine a noneconomic damages award in a recent case as a factor in our analysis of whether the court abused its discretion by refusing to reduce appellee's award below $10 million. In *Abate, supra,* this Court concluded that an award of $9 million in noneconomic damages[28] did not shock the conscience. *See Abate,* 121 Md.App. at 691–93, 710 A.2d 944. We relied on *Owens–Illinois, Inc. v. Zenobia,* in which the Court of Appeals rejected a challenge to an award for a living plaintiff in the amount of $1,200,000. The trial judge in *Abate* summarized that "the test is not how high the verdicts are. The test is whether it shocks the conscience of the [c]ourt.... The simple fact is that the amounts, having seen what I saw in this case, just do not shock my conscience." *Abate,* 121 Md.App. at 692, 710 A.2d 944. Consequently, while comparison to other similar cases is helpful, a review of the specific evidence presented to the jury, rather than a mathematical analysis, more appropriately enables us to determine whether the award was shocking.[29]

While appellant relies on comparing the verdict in the instant case to other comparable cases, appellee relies on the evidence presented to the jury to demonstrate that the award was not shocking or grossly excessive. The facts of this case

---

**28.** The jury's award consisted of $3 million for personal injuries suffered by plaintiff, $1 million for injury to the marital relationship during plaintiff's lifetime, and $5 million for wrongful death. Appellant contests the relevance of this award, asserting that the noneconomic portion only totals $3 million. We disagree. Wrongful death damages are not limited to pecuniary loss and, in part, include the non-pecuniary damages of mental anguish, emotional pain and suffering, and loss of society. *See* C.J. § 3–904(d). These same non-pecuniary damages are included in the definition of noneconomic damages from C.J. § 11–108.

**29.** We note, however, that, in addition to *Abate,* other awards of noneconomic damages well over the average amount submitted by appellant have been affirmed on appeal. *See Ford Motor Co. v. Wood, supra* (affirming an award based on noneconomic damages in the amount of $8 million and an award for a different plaintiff for $6.29 million); *Anchor Packing Co. v. Grimshaw, supra* (affirming an award for $3.3 million in noneconomic damages).

are unique in that appellee was forty-one years of age at the time of the verdict and still living while suffering from mesothelioma. The trial court instructed the jury that, "[i]n this action for damages, you should consider ... the noneconomic damages ... those sustained in the past and reasonably probable to be sustained in the future. Those damages are damages which you, the jury, may find for pain, suffering, inconvenience, physical impairment, disfigurement, and any other nonpecuniary injury." Appellee is likely to sustain considerable noneconomic damages in the future, unlike many victims of mesothelioma or asbestosis who do not live to see their cases reach trial.

Evidence was presented to the jury during appellee's video-taped deposition, which was played at trial on March 25 and 26, 1997, of the impact of mesothelioma on appellee. Testimony included that appellee was removed from an experimental trial clinic because the cancer surrounding his aorta could not be surgically removed. The failed surgery involved an incision—from the rib cage, around the side of the abdomen, angled up near the shoulder, and ending in the center of the back—which has resulted in "sharp pains at different places ... down deep in the tissue" and chronic pain near the abdomen. Multiple rounds of chemotherapy followed the surgery, and appellee's deposition included a description of the violent nausea and physical pain that resulted. Finally, the jury considered the fact that appellee was only forty-one years of age at the time of the trial with five children and a wife.

In his memorandum opinion, the trial judge commented that the evidence was "compelling" and summarized the following with respect to appellee:

He has endured numerous surgeries and chemotherapy treatments. There is more surgery and chemotherapy planned. As the disease progresses his suffering will continue with weight loss, shortness of breath, greater pain, and increased medication to deal with the pain. He will become more disabled and dependent on others. Throughout this suffering, [appellee] has been and will be aware of this pain, this disability, and that he will die a premature

death due to mesothelioma. He knows that he will miss the once expected years ahead with his five children and his wife.

We are satisfied that the court considered the claim of excessiveness on its merits. Furthermore, the court demonstrated that it applied the appropriate standard in its determination by stating that, "[b]ased on this evidence, with the fullest consideration possible given to the amount returned by the jury, this court believes the verdict was not excessive in and of itself." The court examined the evidence and did not abuse its discretion by determining that the jury's award was not excessive. In addition, the court reduced the award, although not on the grounds of excessiveness, from $16,286,000 [30] to $10 million to conform with appellee's *ad damnum* clause that sought $10 million in damages.

## V. AMENDMENT OF THE COMPLAINT AFTER THE JURY VERDICT

 Appellee argues that the court erred by refusing to allow his requested amendment of the *ad damnum* clause of the complaint following the jury's verdict of $16,286,000. In the *ad damnum* clause, appellee sought $10 million in damages. Consequently, following citation to case law, the court decided that "the [appellee is] bound by the amount of damages prayed in the complaint's *ad damnum* clause."

The court principally cited *Falcinelli v. Cardascia,* 339 Md. 414, 663 A.2d 1256 (1995), which discussed in detail the law in Maryland regarding amendment of the *ad damnum* clause after a jury returns its verdict. In *Falcinelli,* the plaintiff was awarded $205,187.08 even though she only sought $100,000 in the complaint. The circuit court subsequently granted plaintiff's motion to amend the amount claimed in the complaint. It was contended that, when the verdict exceeds the *ad damnum* clause, the defendant, upon timely application, is entitled to a *remittitur* to the amount of the *ad damnum.*

---

**30.** The $16,286,000 jury award consisted of $1,286,000 in economic damages and $15 million in noneconomic damages.

The plaintiff, however, argued that MD. RULE 2–341, by omitting any time limit, permitted a post-verdict amendment as long as leave of the court was obtained.

The Court of Appeals issued a writ of *certiorari* prior to consideration of the matter by the Court of Special Appeals and began by commenting that "Maryland case law has uniformly treated the *ad damnum* as a limitation on recovery. The problem is discerning the nature of the limitation." *Falcinelli,* 339 Md. at 423, 663 A.2d 1256 (emphasis added). The Court quoted its prior statement, although recognizing that it was *dicta,* that "the recovery, if any, by the plaintiff cannot exceed in nature or amount either the damage proved or the sum claimed in the *ad damnum,* whichever is the lesser." *Id.* at 423, 663 A.2d 1256 (quoting *Scher v. Altomare,* 278 Md. 440, 442, 365 A.2d 41 (1976)).[31] The Court affirmed the circuit court's judgment on procedural grounds;[32] nevertheless,

---

**31.** *See also Finch v. Mishler,* 100 Md. 458, 462, 59 A. 1009 (1905) (reflecting that the plaintiff remitted the thirty-two dollars by which the judgment exceeded the *ad damnum* ); *Attrill v. Patterson,* 58 Md. 226, 260 (1882) ("requiring the plaintiff to remit so much of the verdict as was in excess of the damages laid in the declaration, was in entire conformity with the law, practice and decisions of the State"); *Zeller v. Greater Baltimore Med. Ctr.,* 67 Md.App. 75, 83, 506 A.2d 646 (1986) ("the rules permit a request to amend until the jury retires to deliberate"); *Carl M. Freeman Assocs. v. Murray,* 18 Md.App. 419, 420 n. 3, 306 A.2d 548 (stating that a *remittitur* is proper if the plaintiff recovers damages in excess of those claimed in the declaration), *cert. denied,* 269 Md. 756 (1973).

**32.** After the jury returned its verdict in *Falcinelli,* the defendant filed a motion for judgment notwithstanding the verdict and the plaintiff filed the motion to amend. The court denied defendant's motion and granted plaintiff's. The defendant, however, did not appeal within thirty days of the court's decision, instead waiting until after the court denied its motion for reconsideration of the motion for judgment notwithstanding the verdict. The Court of Appeals, therefore, held that the defendant did not timely appeal the circuit court's judgment. In addition, the Court held that "the *ad damnum* does not inherently limit the power of the jury to render a verdict and does not inherently limit the power of the court to enter a judgment." *Falcinelli,* 339 Md. at 427, 663 A.2d 1256 (emphasis added). We believe that this holding clarifies procedural matters but was not intended to affect the substantive rule that a plaintiff may not recover damages in excess of the *ad damnum* clause.

these grounds do not affect application of the rule in the current appeal. It appears that because post-verdict amendments found no support in Maryland's legal history, the Court "assume[d], *arguendo*, that Rule 2–341 does not provide for the grant of leave to amend after a verdict has been returned." *Id.* at 429, 663 A.2d 1256.

Based on the case law as of October 15, 1997, when the court filed its memorandum opinion, the court did not err by refusing to grant appellee leave to amend the *ad damnum* clause of the complaint. Furthermore, the court did not abuse its discretion by determining that allowing appellee to amend the *ad damnum* clause would unduly prejudice appellant. The court reasoned:

> Throughout the trial, [appellant] was on notice that [appellee] was claiming $10,000,000 in damages. [Appellee] was in the best position to know and obtain information about the extent of his injuries and damages at all phases of this case. There was nothing to prevent [appellee] from seeking to amend his complaint at the commencement of or during trial. [Appellant] proceeded through the discovery period and settlement negotiations believing that $10,000,000 was its full exposure to liability. To allow post-verdict amendment of the complaint would cause undue prejudice to [appellant].

Given Maryland's legal history of disfavoring the amendment of *ad damnum* clauses after a verdict and the principle that pleadings should provide notice to the parties of the nature of the claims and define the boundaries of the litigation, *see Scott v. Jenkins*, 345 Md. 21, 27–28, 690 A.2d 1000 (1997), the court did not abuse its discretion by refusing to allow a post-verdict amendment. Although liberal amendment of pleadings is common practice prior to or during trial, it is not common after the verdict, especially when amendment would prejudice appellant by increasing its liability over sixty percent.[33]

---

33. Because of Maryland's disfavorable treatment of amendments to *ad damnum* clauses after the verdict, we are not persuaded by appellee's reliance on case law from other jurisdictions. *See Loomis v. Civetta*

█ Since this opinion, however, the rule regarding amendment of pleadings in the circuit court has changed. Effective July 1, 1998, a Committee Note was added to Rule 2–341 stating that, "[b]y leave of court, the court may grant leave to amend the amount sought in a demand for a money judgment after a jury verdict is returned." Based on this addition to Rule 2–341, we must examine whether the new provision was intended to apply retroactively, thereby requiring a remand for the trial court, in its discretion, to determine whether to grant appellee leave to amend.

█ We begin with the following principle:

As a general rule, statutes are presumed to operate prospectively and are to be construed accordingly. The presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary. Moreover, even where permissible, retrospective application is not found except upon the plainest mandate in the legislation.

*Washington Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 560–61, 520 A.2d 1319 (1987) (citations omitted); *see also Arundel Corp. v. County Comm'rs,* 323 Md. 504, 510, 594 A.2d 95 (1991); *Mason v. State,* 309 Md. 215, 219, 522 A.2d 1344 (1987). The reasoning behind this general rule is that, because retrospective application of a statute attempts to determine the legal significance of acts occurring before the effective date of the statute, the potential for interference with an individual's substantive rights increases. *See Riverdale,* 308 Md. at 561, 520 A.2d 1319 (citing *State Comm'n on Human Relations v. Amecom Div. of Litton Sys.,* 278 Md. 120, 360 A.2d 1 (1976)). Therefore, "[t]his rule of construction is particularly applicable

---

*Corinno Constr. Corp.,* 54 N.Y.2d 18, 444 N.Y.S.2d 571, 429 N.E.2d 90 (N.Y.1981); *Whitfield Tank Lines, Inc. v. Navajo Freight Lines, Inc.,* 90 N.M. 454, 564 P.2d 1336 (N.M.App.), *cert. denied,* 90 N.M. 637, 567 P.2d 486 (N.M.1977). The decisions in these cases, that a party is not prejudiced by recovery of damages that exceed the *ad damnum* clause, do not lead us to the conclusion that the trial court abused its discretion.

where the statute adversely affects substantive rights, rather than only altering procedural machinery." *Id.* at 561–62, 520 A.2d 1319 (quoting *State Farm Mut. Auto. Ins. Co. v. Hearn,* 242 Md. 575, 582, 219 A.2d 820 (1966)).

The concern of the effect on substantive rights has resulted in varying treatment of newly enacted laws depending on whether they are viewed as affecting substantive or procedural rights. Despite the presumption of prospective application, in *Holland v. Woodhaven Building & Dev., Inc.,* 113 Md.App. 274, 283, 687 A.2d 699 (1996), we cited a line of cases holding that, "when a legislative change in law affects only procedural matters, rather than substantive rights, it applies to all actions, whether accrued, pending, or future, unless a contrary intention is expressed." *See Roth v. Dimensions Health Corp.,* 332 Md. 627, 636–38, 632 A.2d 1170 (1993); *Starfish Condominium Assoc. v. Yorkridge Serv. Corp.,* 295 Md. 693, 705, 458 A.2d 805 (1983); *Winston v. Winston,* 290 Md. 641, 649–50, 431 A.2d 1330 (1981); *Richardson v. Richardson,* 217 Md. 316, 320, 142 A.2d 550 (1958). On the other hand, we also recognized in *Holland* a line of cases following the principle that "absent legislative intent to the contrary, a change in procedural law will not be applied retroactively to undo proceedings that already have concluded prior to the passage of the law." *Holland,* 113 Md.App. at 284, 687 A.2d 699. *See Luxmanor Citizens Assoc. v. Burkart,* 266 Md. 631, 645, 296 A.2d 403 (1972); *The Wharf at Handy's Point, Inc. v. Department of Natural Resources,* 92 Md.App. 659, 675–76, 610 A.2d 314, *cert. denied,* 328 Md. 239, 614 A.2d 84 (1992).

 After reviewing these contrary principles in *Holland,* we concluded that the following principles survived *Riverdale* and apply to the operation of a newly enacted statute:

[A]bsent clear legislative intent to the contrary, (1) a statute ordinarily will be presumed to operate prospectively; (2) a statute that changes procedure only ordinarily will be applied to pending cases; and (3) new procedural law, al-

though applicable to pending cases, will not ordinarily be applied to undo procedures that already have concluded. *Holland,* 113 Md.App. at 287, 687 A.2d 699. Application of these principles leads us to the conclusion that Rule 2–341 should not be applied retroactively. Rule 2–341 does not contain any statement instructing or implying that adoption of the Committee Note should be applied retroactively. In *Riverdale,* we stated that the legislature knows how to express its intent when it desires retroactive application. *See Riverdale,* 308 Md. at 568, 520 A.2d 1319. Therefore, if retroactive application was intended, a statement to that affect should have been included with Rule 2–341. The only language providing any guidance is that the effective date of the new rule is July 1, 1998, which does not address the issue of retroactive application.

Furthermore, a review of cases applying procedural amendments retroactively supports our conclusion. *See Roth v. Dimensions Health Corp.,* 332 Md. at 637, 632 A.2d 1170 (holding that an extension of time for filing a certificate of qualified expert in a medical negligence suit filed with the Health Claims Arbitration Office could be retroactively applied because the statute did not interfere with substantive or vested rights); *Starfish Condominium Assoc.,* 295 Md. at 708, 458 A.2d 805 (applying an amendment retroactively despite the question of standing because there was no change in substance and no enlargement of liability was effected); *Winston,* 290 Md. at 649–50, 431 A.2d 1330 (retroactive application allowed where separation and divorce agreements and motions for injunctive relief, that were filed during litigation, postdated the statute's enactment); *Richardson,* 217 Md. at 320–23, 142 A.2d 550 (statute extending the time for setting aside a decree *pro confesso* was enacted before the parties argued a motion to set aside the decree; therefore, the newly enacted time period applied). Unlike these cases, retroactive application in the instant case would not affect only the procedural nature of the proceedings. Instead, such application would interfere with substantive rights, namely appellant's vested interest in the $10 million final judgment against it. Retroac-

tively applying Rule 2–341's adoption of the Committee Note would expose appellant to the potential of an increased liability of over $6 million. Therefore, the newly enacted Rule 2–341 not only changes procedure, but also affects substantive rights that already have been decided via the trial court's final judgment. Consequently, we shall apply Rule 2–341 prospectively and affirm the court's decision to deny appellee leave to amend the *ad damnum* clause after the jury's verdict.[34]

## VI. REFUSAL TO SUBMIT PUNITIVE DAMAGES TO THE JURY

■ Appellee finally argues that, based on the evidence presented, the court erred by refusing to submit the requested issue of punitive damages to the jury. Appellant counters by asserting that the evidence presented is strikingly similar to that of *Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 682 A.2d 1143 (1996), in which the Court of Appeals ruled that the plaintiff had not met the standard for punitive damages that would have allowed him to present a jury question.

■ We begin by setting forth the standard for punitive damages in a products liability case, as enunciated in *Owens–Illinois, Inc. v. Zenobia, supra.* An award of punitive damages depends upon the heinous nature of the defendant's tortious conduct and is based upon the purpose of such damages, punishment, and deterrence. *See Zenobia*, 325 Md. at 454, 601 A.2d 633. Therefore, "punitive damages are awarded in an attempt to punish a defendant whose conduct is

---

**34.** As a result of this holding, we decline discussion of the parties' arguments as to what standard should be applied by a trial court when a request is made to amend the *ad damnum* clause after a verdict has been rendered. We note, however, that a review of the minutes of Rules Committee meetings in 1997 prior to the amendment demonstrates that the adoption of the Committee Rule was intended to provide trial courts with discretion whether to grant amendment of an *ad damnum* clause after the verdict is returned. It does not appear that this discretion should be used liberally, but rather, that the addition to Rule 2–341 occurred in part to curb the growing amount of excessive *ad damnum* clauses by affording the limited opportunity to amend after verdict based on the circuit court's discretion.

characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Id.*

In a products liability case, the "evil motive" generally characterizing actual malice consists of "actual knowledge of the defect and deliberate disregard of the consequences." *Id.* at 462, 601 A.2d 633. Consequently, actual malice in a products liability case, based upon either negligence or strict liability, requires proof of "(1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Id.* "Actual knowledge" requires that the defendant actually knew of the product's danger at the time the product left its control or possession. *See id.* (citation omitted; footnote omitted). Furthermore, "conscious or deliberate disregard" on behalf of the defendant is required, and the Court of Appeals

> emphatically state[s] that negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard. Instead the test requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer.

*Id.* at 463, 601 A.2d 633. Finally, because of the penal nature and potential for debilitating harm found with a punitive damages award, "in *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *Id.* at 469, 601 A.2d 633.

Based upon the aforementioned standards, we analyze the evidence presented to determine whether the Court of Appeals's decision in *Garrett* is controlling or whether appellee has presented additional evidence warranting remand on the issue of punitive damages. In ruling whether appellee met his burden of proof concerning punitive damages, we do not consider the weight of the evidence; that is a jury function. Rather, we "pass upon the sufficiency of the evidence to take a case to the jury at all." *Garrett*, 343 Md. at 540, 682 A.2d 1143 (citations omitted). Consequently, as in *Garrett*, "we

shall have to find that the evidence was insufficient as a matter of law for a reasonable jury to have found *by a clear and convincing standard* that [appellant] had actual knowledge" of the dangers of its product and that appellant made a bad faith decision to market the product despite its knowledge of the threat. *See id.* at 540–41, 682 A.2d 1143.

In the case *sub judice*, the piping systems to which appellee was exposed were installed on the Nimitz from 1968–1973.[35] Therefore, the Court of Appeals's rationale from *Garrett*, 343 Md. at 537–51, 682 A.2d 1143, and *ACandS, Inc. v. Godwin*, 340 Md. 334, 363–67, 667 A.2d 116 (1995), about the general state-of-the-art knowledge up to 1972 concerning asbestos and its effects, is controlling. Furthermore, our review of the alleged additional evidence presented by appellee leads to the conclusion that appellee has not presented new evidence that would be sufficient to create a jury question with respect to punitive damages.

Appellee alleges that the following additional evidence proves actual malice and bad faith on behalf of appellant, thereby creating a jury question on the punitive damages issue: tests performed at the Saranac Laboratories in 1948 alerting appellant to the dangers of asbestos, interoffice memorandum from 1966 regarding the threshold limit value's potential for causing cancer, proof that appellant had an alternative asbestos-free product which it removed from the market due to low profit margins, the insufficiency of warning labels placed on products beginning in 1966, and allegations that appellant's products continued to contain asbestos even after having been marketed as asbestos-free. We agree with appellant that "[appellee] has not pointed to any additional medical or scientific evidence that in any way alters the *Garrett* Court's conclusion. For this reason, and because most, if not all, of the evidence [appellee] does rely on was

---

35. Testimony demonstrates that eighty-five percent of the piping systems on the ship had been installed and insulated by the time that the ship was placed in the water in 1972.

actually before the court in *Garrett, Garrett* compels affirmance of the trial court's ruling on punitive damages."

Our review of the punitive damages issue in *Garrett* and *Godwin* applies in the instant case because appellee does not present sufficient evidence to convince us that we should engage in additional analysis. Therefore, we omit a repetitious discussion of why appellee fails to present a jury question on the punitive damages issue, and adopt by reference the discussions from *Garrett,* 343 Md. at 537–51, 682 A.2d 1143, and *Godwin,* 340 Md. at 363–67, 667 A.2d 116. As a review of the insufficiency of the evidence presented by appellee, we look to *Garrett's* conclusions concerning actual knowledge:

> [Appellant's] belief, during the time period of concern in this case, in a "safe" level of asbestos dust was entirely consistent with the prevailing view among industrial hygienists that "asbestos-caused diseases, principally asbestosis, could be generally avoided if dust in the work environment could be kept below a certain limit. . . . "

*Garrett,* 343 Md. at 543, 682 A.2d 1143 (quoting *Godwin,* 340 Md. at 365, 667 A.2d 116).

> Secondly, we recall the conclusions concerning bad faith:

> At all relevant times the widespread belief was that the extent of the health risk depended, in large part, on the length and intensity of exposure. . . . It may be that a jury would believe that the corporate decision to adopt health warnings came too late and, even then, that it was motivated only by the desire to minimize tort liability. It may also be that a jury would believe that [appellant] was not only negligent in these respects, but that it was grossly negligent. *These possible inferences or conclusions, however, do not demonstrate that [appellant] made a bad faith decision to market . . . [Kaylo] in conscious or deliberate disregard of the threat to the safety of the consumer. [Appellees] have not shown by clear and convincing evidence that [appellant] did not in good faith believe that its recommendations for exhaust ventilation, . . . housekeeping, and use of respirators were reasonable protection for users.*

*Id.* at 550–51, 682 A.2d 1143, (quoting *Godwin,* 340 Md. at 378–79, 667 A.2d 116). The alleged "additional" evidence does not provide any new proof that would lead us to the conclusion that appellee has demonstrated a sufficient claim for punitive damages. Therefore, we rely on the decisions in *Garrett* and *Godwin* holding that appellant did not have the requisite actual knowledge or bad faith to be subject to punitive damages.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR SUBMISSION OF FAC-TUAL ISSUE WITH RESPECT TO C.J. § 11–108 ONLY TO JURY.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.**

### ON MOTION FOR CLARIFICATION

On February 1, 1999, we filed our reported opinion, affirming in part and reversing in part the judgment of the Circuit Court for Baltimore City. The case was remanded to the circuit court for the submission of the issue of when appellee's mesothelioma "arose" for purposes of determining the applicability of the statutory cap, pursuant to MD.CODE (1995 Repl. Vol., 1998 Supp.), CTS. & JUD.PROC., § 11–108. Subsequently, on February 25, 1999, appellee filed a Motion for Clarification, raising the question of the proper computation of post-judgment interest. In the case at hand, post-judgment interest shall accrue, commencing from the time of the entry of the original judgment by the Circuit Court for Baltimore City, as follows: at the legal rate, calculated as a percentage of $350,000, in the event that the jury determines that appellee's mesothelioma "arose" after July 1, 1986; or, alternatively, as a percentage of the original judgment of $10,000,000, computed from the time of the entry of said judgment, in the event the jury determines that appellee's mesothelioma "arose" before July 1, 1986.